[No. D033640. Fourth Dist., Div. One. June 13, 2000.]

PACIFIC BELL, Plaintiff and Appellant, v.
CITY OF SAN DIEGO, Defendant and Respondent.

**COUNSEL**

Pacific Telesis Group Legal Department and J. Scott Paisley for Plaintiff and Appellant.

Casey Gwinn, City Attorney, Anita M. Noone, Assistant City Attorney, and Grant Richard Telfer, Deputy City Attorney, for Defendant and Respondent.

**OPINION**

**McDONALD, J.**—Plaintiff Pacific Bell's facility suffered substantial damage when a corroded cast-iron water pipe servicing a fire hydrant burst and the escaping water flooded the facility. The pipe was owned and maintained by defendant City of San Diego (City) and would not have burst had it not been corroded.

Pacific Bell sought inverse condemnation damages from City. Pacific Bell asserted that because City had no preventive maintenance plan to inspect or monitor the effect of corrosion on old cast iron pipes, burst pipes resulting in

damage to adjoining private property was an inevitable consequence of City's water delivery system as designed, constructed and maintained.

There are two principal issues. First, do the immunities under the Tort Claims Act (Gov. Code, § 810 et seq.),[1] including the so-called fire hydrant immunity (§ 850.4),[2] bar an inverse condemnation claimant from recovering damages caused by a burst pipe providing water service to a fire hydrant? Second, if the Tort Claims Act immunities do not apply, under inverse condemnation principles is City strictly liable for damages caused by its bursting pipe or must the claimant establish City's unreasonable conduct?

City contends it is immune from liability for damage to Pacific Bell's facility because the gravamen of Pacific Bell's claim is City's negligent maintenance program, which must be prosecuted under the Tort Claims Act, and the fire hydrant immunity bars any claim against City under the Tort Claims Act. Pacific Bell contends the Tort Claims Act and its immunities do not apply to its inverse condemnation claim. Pacific Bell further argues that *McMahan's of Santa Monica v. City of Santa Monica* (1983) 146 Cal.App.3d 683 [194 Cal.Rptr. 582] (*McMahan's*) is controlling and that under inverse condemnation City must pay for the damage without proof of fault. City contends *McMahan's* has been substantially undercut by a trio of California Supreme Court cases that replaced *McMahan's* inverse condemnation strict liability rule with a reasonableness rule under which a private party damaged by a public entity's water system must show the public entity acted unreasonably in constructing or maintaining the system.

## I

### FACTS

#### A. *The Deteriorating Pipes*

The dispositive facts are undisputed. City's water delivery system has approximately 2,700 miles of pipes, about 180 miles of which are made of cast iron. The burst cast-iron pipe that resulted in damage to Pacific Bell's facility was installed in 1958.

Cast-iron pipes are subject to a corrosive process known as graphitization, in which the iron component of the pipe is leached into the soil, leaving a

---

[1] All further statutory references are to the Government Code unless otherwise noted.

[2] Section 850.4 provides in part that "[n]either a public entity, nor a public employee acting in the scope of his [or her] employment, is liable for any injury resulting from the condition of fire protection or firefighting equipment or facilities or . . . for any injury caused in fighting fires."

brittle shell of graphite. Graphitization makes the pipe less able to withstand water pressure fluctuations and more susceptible to breakage. Because of the high number of graphitization-caused breaks in older cast-iron pipes,[3] City has concluded that all cast-iron pipes in its system need to be replaced.

City has no program or method for testing or inspecting cast-iron pipes to identify those needing immediate replacement. Instead, City learns a cast-iron pipe needs replacement only when it breaks. City replaces an old cast-iron pipe if it breaks, or if there is a change of service, or in conjunction with replacing the water main to which it is attached.

In the 10-year period before 1997, the city council denied 28 requests for a water rate increase to fund City's water pipe repair and rehabilitation efforts, including replacing cast-iron pipes. Under City's current schedule, it will take between 10 and 15 years to replace all of the cast-iron pipes.

### B. *The April 1997 Break*

City installed, owned and maintained a fire hydrant near the corner of Sixth and Robinson. Water to the hydrant was provided by a six-inch cast-iron pipe installed by City in 1958. Prior to April 1997 the hydrant had been knocked over six times and City installed bumper posts around the hydrant to protect against future knockovers. City also fitted the hydrant with a breakaway check valve, known as a flapper valve, which is designed to automatically snap shut in the event the hydrant is knocked over, thereby minimizing the loss of water.

On April 11, 1997, an automobile struck the Sixth and Robinson hydrant and knocked it over. The flapper valve snapped shut as intended. However, the resulting spike in water pressure caused the cast-iron pipe to burst or disintegrate near its junction with the main water line. The pipe burst only because it was corroded; the pipe would have withstood the pressure change but for its severely corroded condition.

It took between one and two hours to completely shut off water flowing from the broken pipe into the basement of Pacific Bell's facility. Pacific Bell suffered damages and cleanup costs of more than $170,000.

### C. *The Lawsuit*

Pacific Bell filed a multicount complaint against City to recover the damages to its facility. City's answer asserted numerous defenses, including

---

[3]Although cast-iron pipes account for less than 10 percent of the total pipes in the system, these pipes have at times accounted for 80 percent of the breaks in the system.

the fire hydrant immunity (§ 850.4). At trial Pacific Bell dismissed all counts except its count alleging inverse condemnation. The court informed the parties of its intention to enter judgment for City, and Pacific Bell timely requested a statement of decision. The court concluded that: (1) under *Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368 [41 Cal.Rptr.2d 658, 895 P.2d 900] (*Customer*) a claim may not be brought under inverse condemnation if the same claim would be barred by the statutory immunities described in the Tort Claims Act; (2) Pacific Bell did not demonstrate a deliberate act undertaken in fulfillment of a public purpose necessary to establish an inverse condemnation claim under the California Constitution; and (3) under *Bunch v. Coachella Valley Water Dist.* (1997) 15 Cal.4th 432 [63 Cal.Rptr.2d 89, 935 P.2d 796] (*Bunch*), a plaintiff asserting an inverse condemnation claim based on flood damage caused by a public improvement is required to show the public entity acted unreasonably and Pacific Bell did not show City's maintenance program was unreasonable.[4] The court entered judgment for City and Pacific Bell appeals.

II

ANALYSIS

A. *General Principles*

The determinative facts in this case are undisputed and we address only issues of law. Accordingly, we review de novo the trial court's legal conclusions. (*San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517, 528 [86 Cal.Rptr.2d 473].)

■ An inverse condemnation action, in contrast to a condemnation action initiated by the condemning public agency, is an eminent domain action initiated by one whose property was taken or damaged for public use.

---

[4]The court also found that corrosion in the pipe contributed to the pipe failure but that it was not a substantial cause of Pacific Bell's damage. The trial court's conclusion is inconsistent with the controlling principles on causation. A public entity can be liable for inverse condemnation if the public improvement is a substantial cause of the injury, even if it is only one of several concurrent causes. (*Marshall v. Department of Water & Power* (1990) 219 Cal.App.3d 1124, 1138 [268 Cal.Rptr. 559].) In *Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550 [253 Cal.Rptr. 693, 764 P.2d 1070] (*Belair*), the court explained that the public improvement is a substantial concurrent cause if "the injury occurred in substantial part because the improvement failed to function as it was intended. The public improvement would cease to be a substantial contributing factor, however, where it could be shown that the damage would have occurred even if the project had operated perfectly . . . ." (*Id.* at pp. 559-560.) Because the only evidence below was that the damage would not have occurred had the pipe not been corroded, the court's finding of no causation is unsupported by the evidence. On appeal, City commendably abandons any claim that we should affirm the judgment based on lack of causation, and we do not consider this issue further.

The principles of eminent domain law apply to inverse condemnation proceedings. (*Belmont County Water Dist. v. State of California* (1976) 65 Cal.App.3d 13, 19, fn. 3 [135 Cal.Rptr. 163].) The fundamental policy underlying the concept of inverse condemnation is that the costs of a public improvement benefiting the community should be spread among those benefited rather than allocated to a single member of the community. (*Belair, supra,* 47 Cal.3d at p. 558.)

A successful inverse condemnation claimant must prove that a public entity has taken or damaged its property for a public use. (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 939-940 [55 Cal.Rptr.2d 724, 920 P.2d 669].) Article I, section 19 of the California Constitution has been interpreted by our Supreme Court to mean that "any actual physical injury to real property proximately caused by [a public] improvement as deliberately designed and constructed is compensable . . . whether foreseeable or not." (*Albers v. County of Los Angeles* (1965) 62 Cal.2d 250, 263-264 [42 Cal.Rptr. 89, 398 P.2d 129].) Damage caused by the public improvement as deliberately conceived, altered or maintained may be recovered under inverse condemnation (*Barham v. Southern Cal. Edison Co.* (1999) 74 Cal.App.4th 744, 755 [88 Cal.Rptr.2d 424]) and the presence or absence of fault by the public entity ordinarily is irrelevant. (*Marshall v. Department of Water & Power, supra,* 219 Cal.App.3d at p. 1138.)

### B.  *The Immunity for Fire Facilities Does Not Preclude Pacific Bell from Pursuing an Inverse Condemnation Claim*

█ The burst water pipe causing damage to Pacific Bell's facility was part of City's firefighting equipment. The courts have concluded that section 850.4 provides the government absolute immunity against claims under the Tort Claims Act for injury to persons or property caused by firefighting equipment. (See, e.g., *Cochran v. Herzog Engraving Co.* (1984) 155 Cal.App.3d 405, 409 [205 Cal.Rptr. 1] [claim for wrongful death under Tort Claims Act alleging city negligently inspected and advised private business on fire suppression equipment barred by immunity provisions].) Thus, in *Razeto v. City of Oakland* (1979) 88 Cal.App.3d 349 [151 Cal.Rptr. 791], vandals turned on a fire hydrant, which act caused water damage to the plaintiff's home. The plaintiff sued the city, alleging negligent installation and maintenance of the hydrant under the Tort Claims Act. The court found section 850.4 conferred immunity on the city from claims under the Tort Claims Act. (*Razeto, supra,* 88 Cal.App.3d at pp. 351-353.)

However, the immunities provided by the Tort Claims Act do not insulate a public entity from liability for inverse condemnation; the constitutional

provisions requiring compensation for property taken or damaged by a public use overrides the Tort Claims Act and its statutory immunities. (*Baldwin v. State of California* (1972) 6 Cal.3d 424, 438 [99 Cal.Rptr. 145, 491 P.2d 1121].) Thus, a plaintiff who establishes the elements of an inverse condemnation claim may recover for property damage even though his tort claim has been rejected.[5] (See, e.g., *Marshall v. Department of Water & Power, supra,* 219 Cal.App.3d at pp. 1136-1141.)

City argues, and the trial court found, that under *Customer, supra,* 10 Cal.4th 368, a party may not avoid the Tort Claims Act statutory immunities by recasting a negligence claim as one for inverse condemnation, and that Pacific Bell's claim here alleged negligent maintenance. In *Customer*, police damaged a retail store while pursuing a fleeing suspect. (*Id.* at pp. 374-375.) The plaintiff store owner sought to recover damages from the city alleging a claim for negligence under the Tort Claims Act and a claim for inverse condemnation. The trial court rejected the negligence claim based on the section 820.2 immunity, and rejected the inverse condemnation claim because the damage resulted from the exercise of the "police power."[6] (10 Cal.4th at pp. 371-372.) The *Customer* court concluded that the addition of

---

[5]For that reason, many of the cases relied on by City are inapposite. For example, the plaintiff in *Razeto* made no claim for inverse condemnation, and therefore the *Razeto* court did not consider whether the immunities provided under the Tort Claims Act would insulate a governmental entity from liability for inverse condemnation. Similarly, although the court in *Valley Title Co. v. San Jose Water Co.* (1997) 57 Cal.App.4th 1490 [67 Cal.Rptr.2d 636] concluded the immunity provided to public entities under section 850.4 was equally applicable to a private water company supplying firefighting facilities by virtue of Public Utilities Code section 774 (57 Cal.App.4th at pp. 1498-1505), it did not examine whether the immunities under the Tort Claims Act would bar a claim for inverse condemnation.

[6]The so-called police power or emergency exception to the inverse condemnation compensation requirement has a venerable history in both state and federal courts. It is a specific application of the general rule that damage to, or even destruction of, property pursuant to a valid exercise of the police power often requires no compensation under the just compensation clause. Thus, "[i]njury to property can and often does result from the demolition of buildings to prevent the spread of conflagration, from the abandonment of an existing highway, from the enforced necessity of improving property in particular ways to conform to police regulations and requirements. . . . And equally well settled and understood is the law that in the exercise of this same power property may in some, and indeed in many, instances be utterly destroyed. The destruction of buildings, of diseased animals, of rotten fruit, of infected trees, are cases that at once come to mind as applicable to both personalty and realty. Always the question in each case is whether the particular act complained of is without the legitimate purview and scope of the police power. If it be, then the complainant is entitled to injunctive relief or to compensation. If it be not, then it matters not what may be his loss, it is *damnum absque injuria* [damage without injury]." (*Gray v. Reclamation District No. 1500* (1917) 174 Cal. 622, 638-639 [163 P. 1024].) For example, in *United States v. Caltex, Inc.* (1952) 344 U.S. 149 [73 S.Ct. 200, 97 L.Ed. 157], compensation was denied for an oil terminal facility in Manila that the United States Army destroyed immediately prior to the Japanese invasion of the Philippine Islands to deprive the enemy "of a valuable logistic weapon." (*Id.* at p. 151 [73 S.Ct. at p. 201].) Similarly, *in United States v. Pacific Railroad*

the "or damaged" language to the California Constitution was not intended to expand the scope of California's just compensation clause to permit recovery beyond the ambit of eminent domain and public improvements. The *Customer* court stated:

"The holding in [*Miller v. City of Palo Alto* (1929) 208 Cal. 74 [280 P. 108]]—that damage caused by the negligent conduct of public employees or a public entity does not fall within the aegis of section 19—has been followed repeatedly and uniformly in the more than 60 years that have elapsed since that decision was rendered. [Citations.] In *House* v. *L. A. County Flood Control Dist.*[, *supra*,] 25 Cal.2d 384 . . . , which held that damage caused by the design of a public project gave rise to an inverse condemnation action, then Justice Traynor was careful to explain that '[t]he destruction or damaging of property is sufficiently connected with "public use" as required by the Constitution, if the injury is a result of dangers *inherent in the construction of the public improvement* as distinguished from dangers *arising from the negligent operation of the improvement.*' (25 Cal.2d at p. 396 (conc. opn. of Traynor, J.), italics added [by *Customer*].)

"Similarly, in *Bauer* v. *County of Ventura* (1955) 45 Cal.2d 276, 286 [289 P.2d 1], this court, after concluding that property owners could recover for the damage caused by floodwaters diverted onto their property by a public watercourse and drainage system, took pains to explain that application of the predecessor of section 19 did not 'subject the state to general tort liability under the theory of eminent domain. The defendants contend that the imposition of a duty to compensate for improper maintenance of a public improvement would impose liability for the act of negligently forgetting to close a sluice gate or other negligent acts committed during the routine day to day operation of the public improvement. But the raising of a ditch bank appears on its face to be a deliberate act carrying with it the purpose of fulfilling one or another of the public objects of the project as a whole. . . . The damage to property in this instance resulted not from immediate carelessness but from a failure to appreciate the probability that, functioning as deliberately conceived, the public improvement as altered and maintained

---

(1887) 120 U.S. 227 [7 S.Ct. 490, 30 L.Ed. 634], compensation was denied for bridges destroyed during the Civil War by Union forces as the Confederate army advanced. In *House v. L.A. County Flood Control Dist.* (1944) 25 Cal.2d 384 [153 P.2d 950], our Supreme Court stated that, "Unquestionably, under the pressure of public necessity and to avert impending peril, the legitimate exercise of the police power often works not only avoidable damage but destruction of property without calling for compensation . . . . In such cases calling for immediate action the emergency constitutes full justification for the measures taken to control the menacing condition, and private interests must be held wholly subservient to the right of the state to proceed in such manner as it deems appropriate for the protection of the public health or safety. [Citations.]" (*Id.* at p. 391.)

would result in some damage to private property. *Damage resulting from negligence in the routine operation having no relation to the function of the project as conceived is not within the scope of the rule applied in the present case.* [Citations.]' " (*Customer, supra,* 10 Cal.4th at pp. 381-382, italics added by *Customer.*)

*Customer* held that because the injury was not caused by a public improvement operating as deliberately planned and constructed, the plaintiff's claim was not an inverse condemnation claim but a claim subject to the Tort Claims Act and its attendant immunities. The court stated: "In the present case, of course, the property damage for which Customer seeks to recover bears no relation to a 'public improvement' or 'public work' of any kind. Instead, the damage was caused by actions of public employees having 'no relation to the function' of a public improvement whatsoever. As the foregoing cases demonstrate, property damage caused in such a manner never has been understood to give rise to an action for inverse condemnation in California, but rather has been treated as subject to the general tort principles applicable to governmental entities." (*Customer, supra,* 10 Cal.4th at p. 383, fn. omitted.)

*Customer* did not hold, as City urges, that the existence of an applicable immunity under the Tort Claims Act precludes an inverse condemnation claim. *Customer* held that damages occurring in the exercise of police powers are not compensable through an inverse condemnation action. The court in *Barham v. Southern Cal. Edison Co., supra,* 74 Cal.App.4th 744, rejecting a construction of *Customer* similar to that urged by City here, recognized that: "A clear distinction has been recognized between inverse condemnation which arises out of damage to property caused by the construction or maintenance of public works and that which arises out of an exercise of police powers. [Citation.] In the instant case, the damage arose out of the functioning of the public improvement as deliberately conceived, altered and maintained. Therefore, even under the principles outlined in *Customer*, the Barhams are entitled to recover in inverse condemnation in the instant case. [Citing *Customer*.] [¶] [Defendant] urges *Customer* stands for the proposition that conduct which amounts to negligence cannot support inverse condemnation liability. We do not agree. In fact, several courts have held inverse condemnation principles apply in cases very similar to that at bar. (See, e.g., *Marshall v. Department of Water & Power, supra,* 219 Cal.App.3d 1124 [homeowners recover in inverse condemnation for property consumed by brush fire resulting from downed power cables]; . . . .) *Customer* provides no basis for invalidating these cases." (*Barham v. Southern Cal. Edison Co., supra,* 74 Cal.App.4th at p. 755.)

We agree with *Barham* and interpret *Customer* as holding that a claim for an injury caused by police powers activities, or by negligence in the routine

operation of the improvement that is not related to the function of the project as conceived, is subject to the rules and immunities of the Tort Claims Act, which are not obviated by recasting the claim as an inverse condemnation claim. (Accord, *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 86-87 [87 Cal.Rptr.2d 754] [where damages caused by shoddy maintenance, "takings" analysis applied to allegedly inadequate *plan* of maintenance and Tort Claims Act analysis applied to poor *execution* of plan of maintenance].) *Customer* does not hold that recovery in inverse condemnation for an injury caused by dangers inherent in the functioning of a public improvement as deliberately conceived, altered and maintained is defeated by the Tort Claims Act immunities.[7] Indeed, the construction of *Customer* urged by City would fundamentally change inverse condemnation law. As previously discussed, physical injury to real property proximately caused by a public improvement as deliberately designed and constructed, whether foreseeable or not (*Albers v. County of Los Angeles, supra,* 62 Cal.2d at pp. 263-264), is compensable by an action for inverse condemnation, and ordinarily the claimant need not prove fault by the public entity. (*Marshall v. Department of Water & Power, supra,* 219 Cal.App.3d at p. 1138.) However, if a public entity could defeat an inverse condemnation claim by asserting a statutory immunity, the immunity provided by section 830.6 for a public improvement built according to an approved plan would preclude recovery absent a showing of fault. (See, e.g., *Grenier v. City of Irwindale* (1997) 57 Cal.App.4th 931, 940-941 [67 Cal.Rptr.2d 454] [design immunity applies if any substantial evidence that design was reasonable].) We do not construe *Customer* as sub silentio fundamentally rewriting inverse condemnation law. (See, e.g., *Baldwin v. State of California, supra,* 6 Cal.3d at p. 438 [design immunity under § 830.6 does not bar liability for inverse condemnation].)

Here, we conclude Pacific Bell's claim is not based on City's exercise of the police power and is not a negligence claim recast as an inverse condemnation claim. *Customer* is therefore inapplicable to the instant case.

---

[7]For this reason, the cases relied on by City are inapplicable. For example, in *Lainer Investments v. Department of Water & Power* (1985) 170 Cal.App.3d 1 [215 Cal.Rptr. 812], the negligent act was not turning on a valve after installing a fire service connection, and the court held the city was immune for this operational negligence under the fire facilities immunities. (*Id.* at pp. 5-9.) Similarly, in *New Hampshire Ins. Co. v. City of Madera* (1983) 144 Cal.App.3d 298 [192 Cal.Rptr. 548] and *Heieck and Moran v. City of Modesto* (1966) 64 Cal.2d 229 [49 Cal.Rptr. 377, 411 P.2d 105] (where the negligent acts were turning off a valve and negligently not reopening the valve, respectively), the immunities applied to bar the actions. The damage in each of those cases was not caused by a failure in the system as designed and constructed, but by routine operational negligence having no relation to the function of the project as conceived.

C. *The Water Delivery System as Deliberately Designed and Maintained Was a Substantial Cause of the Damage*

██ One basis for the court's rejection of Pacific Bell's inverse condemnation claim was its conclusion Pacific Bell did not prove the injury was caused by a "deliberate act undertaken in fulfillment of a public object." A claim for inverse condemnation requires proof of injury to property caused by the public improvement "as deliberately designed and constructed . . . whether foreseeable or not." (*Albers v. County of Los Angeles, supra,* 62 Cal.2d at pp. 263-264.) However, the deliberateness requirement is satisfied by a public improvement that as designed and constructed presents inherent risks of damage to private property, and the inherent risks materialize and cause damage. (*House v. L.A. County Flood Control Dist., supra,* 25 Cal.2d at p. 396.)

The evidence here showed City's water delivery system was deliberately designed, constructed and maintained without any method or program for monitoring the inevitable deterioration of cast-iron pipes other than waiting for a pipe to break. Additionally, City received the cost savings from its "replace it when it breaks" method of maintenance, turning down numerous rate increases necessary to fund a different, more proactive approach to replacing these deteriorating pipes. In *Holtz v. Superior Court* (1970) 3 Cal.3d 296 [90 Cal.Rptr. 345, 475 P.2d 441], the court reiterated that the fundamental policy underlying inverse condemnation is to distribute the costs of the public benefit among those benefited by the public improvement rather than imposing a disproportionate burden on the person damaged by the operation of the improvement. (*Id.* at p. 303.) In *Holtz,* the property owners alleged that excavations of land abutting their property for a subway project caused them damages because their buildings lost lateral support and settled and cracked. (*Id.* at p. 299.) The *Holtz* court concluded that the property owners could assert an inverse condemnation claim, reasoning: "Our decision [recognizes that] physical damages proximately resulting from a public improvement must be considered as direct a 'cost' as the property actually condemned or the materials actually utilized in its construction. Indeed, in most instances a public entity may be able to forestall unintended physical damage by initially employing more protective measures in the actual construction of the project; in the instant case, for example, defendants could probably have prevented the damage to plaintiffs' property by expending additional funds in shoring up its excavation. *This comment does not imply, however, that defendants would necessarily be negligent in not expending such funds*; the likelihood of the damage may have been so remote and the expense of the additional protection so great that it was reasonable (hence, non-negligent) for defendants to forego supplemental measures initially. *Nevertheless, since the undertaking of the excavation at this lower cost*

*created some risk, however slight, of damage to plaintiffs' property, it is proper to require the public entity to bear the loss when damage does occur."* (3 Cal.3d at pp. 310-311, italics added.)

To support its conclusion that, under inverse condemnation principles, a governmental entity's choice to obtain cost savings on a project carries with it the corollary obligation to pay for the damages caused when the risks attending these cost-saving measures materialize, the *Holtz* court quoted with approval the reasoning of the Iowa Supreme Court in *Lubin v. Iowa City* (1964) 257 Iowa 383 [131 N.W.2d 765]. *Holtz* noted that: "In [*Lubin*] the city's 80-year-old water main, located six feet below the ground without a reasonable inspection capability, broke and flooded the plaintiffs' basement. The court stated: 'A city . . . so operating knows that eventually a break will occur, water will escape and in all probability flow onto the premises of another with resulting damage. . . . The risk from such a method of opera- tion should be borne by the water supplier who is in a position to spread the cost among the consumers who are in fact the true beneficiaries of this practice and of the resulting savings in inspection and maintenance costs.' " (*Holtz v. Superior Court, supra,* 3 Cal.3d at p. 311, fn. 17, quoting *Lubin, supra,* at p. 391 [131 N.W.2d at p. 770].)

City's decisions to install a system without monitoring capabilities and to use a "wait until it breaks" method for detecting deterioration may well have been reasonable because the costs of a prophylactic approach may have outweighed its benefits. However, the rationale of *Holtz,* as well as its approval of the factually analogous case of *Lubin,* convinces us that "since the undertaking of the [project] at this lower cost created some risk, however slight, of damage to plaintiffs' property, it is proper to require the public entity to bear the loss when damage does occur." (*Holtz v. Superior Court, supra,* 3 Cal.3d at pp. 310-311.) The burdens attending City's cost-saving approach should be spread to the community benefiting from lower water rates rather than imposing the entire cost on those property owners placed in harm's way by City's program.

In *McMahan's, supra,* 146 Cal.App.3d 683, the court concluded a property owner could recover for inverse condemnation under substantively indistin- guishable circumstances from those in this case. In *McMahan's,* the city was aware its water lines were badly deteriorated and that its replacement program would take 30 years. A private property owner's store was damaged when a water main that was severely weakened by corrosive soil conditions burst; the weakened condition of the water main was a substantial cause of the break. *McMahan's* recognized inverse condemnation is the remedy only for an injury to private property caused by a deliberate act for the purpose of

fulfilling one of the public objects of the project as a whole. It also recognized that negligent acts committed during the routine day-to-day operation of the public improvement or negligence in the routine operation having no relation to the functioning of the project as conceived does not create a claim in inverse condemnation. The city argued the rupture of the pipe was caused by negligent maintenance and daily operations and not by a deliberate plan of construction, and that negligent maintenance is not a deliberate act that constitutes a taking. (*Id.* at pp. 694-695.) The court rejected the city's argument, reasoning that under *Bauer v. County of Ventura, supra,* 45 Cal.2d 276, 285, damage resulting from a maintenance program that involves "a deliberate act which has as its object the direct or indirect accomplishment of the purpose of the improvement as a whole" satisfies the "deliberately designed and constructed" requirement. *McMahan's* recognized that, under *Bauer,* the concept of "maintenance" and "construction" can be synonymous for purposes of interpreting California Constitution, article I, section 19, and held that:

"[W]hether the City's program of water main installation and replacement is characterized as 'construction' or 'maintenance,' the fact remains that it was inadequate and contributed to the break due to corrosion of the [water main]. The City's knowledge of the limited life of such mains and failure to adequately guard against such breaks caused by corrosion is as much a 'deliberate' act as existed in *Albers* [v. *County of Los Angeles*], supra, 62 Cal.2d 250. [¶] . . . [¶]

". . . 'The governmental decision to proceed with the project without incorporating the essential precautionary modifications in the plan thus represents more than a mere determination that effective damage prevention is not expedient. It is also a deliberate policy decision to shift the risk of future loss to private property owners rather than to absorb such risk as a part of the cost of the improvement paid for by the community at large. In effect, that decision treats private damage costs, anticipated or anticipatable, but uncertain in timing or amount or both, as a deferred risk of the project. If and when they materialize, however, the present analysis suggests that those costs should be recognized as planned costs inflicted in the interest of fulfilling the public purpose of the project[,] and thus subject to a duty to pay just compensation.' [Quoting Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431, 491-492.]

"In the instant appeal, the City was taking a calculated risk by adopting a plan of pipe replacement and maintenance that it knew was inadequate. The City's plan of replacement of the water mains reflected the deferred risks of the project both foreseeable and unforeseeable, and it is proper to require the City to bear the loss when the damage occurs." (*McMahan's, supra,* 146 Cal.App.3d at pp. 696-698.)

The *McMahan's* court also relied on *Holtz*'s rationale that the underlying purpose of inverse condemnation is to distribute throughout the community the loss inflicted by the public improvements, as well as on *Holtz*'s approval of *Lubin v. Iowa City, supra,* 257 Iowa 383 [131 N.W.2d 765] as a specific example of the cost-spreading rationale in the context of a city's decision to operate a water system at lower inspection and maintenance costs, knowing that eventually a break will occur and cause damage. *McMahan's* agreed with *Holtz* and *Lubin* that it is proper that the losses attending the risk of this method of operation should be " ' "spread . . . among the consumers who are in fact the true beneficiaries of this practice and of the resulting savings in inspection and maintenance costs." [Citations.]' (*Holtz, supra,* 3 Cal.3d at p. 311, fn. 17.)" (*McMahan's, supra,* 146 Cal.App.3d at p. 698, italics omitted.)

We conclude that *McMahan's* correctly applied inverse condemnation principles. Moreover, we conclude *McMahan's* is controlling on the facts of this case and permits Pacific Bell to recover on its claim for inverse condemnation unless, as contended by City, subsequent Supreme Court authority has substantially modified *McMahan's*. We therefore examine this last issue.

### D. *Pacific Bell Was Not Required to Show Unreasonableness as an Element of Its Inverse Condemnation Claim*

The ordinary rule applied in *McMahan's* is that a public entity is strictly liable for inverse condemnation damages. (*Marshall v. Department of Water & Power, supra,* 219 Cal.App.3d at p. 1138.) However, City argues that when private property is damaged by water flooding from a public improvement, a series of Supreme Court decisions has supplanted the ordinary rule of strict liability with a rule of unreasonableness in constructing or maintaining the public improvement. City therefore contends Pacific Bell was required to show City's maintenance program was unreasonable, and because the trial court found against Pacific Bell on this issue it properly denied Pacific Bell's inverse condemnation claim. Because City's argument rests on the import of three Supreme Court decisions, we examine those cases in detail.

#### 1. *The Supreme Court Cases*

In *Belair, supra,* 47 Cal.3d 550, private landowners brought inverse condemnation actions against a public flood control district for property damage when, after several days of heavy storms, a levee failed. The maximum water flow in the channel at the time of the failure had been well

below the levee's design capacity, but erosion at the foundation of the levee had weakened it and caused it to collapse. (*Id.* at pp. 554-556.) The trial court and Court of Appeal ruled against the plaintiffs.[8]

The plaintiffs argued they were entitled to recover without any showing of negligence by the public entity. The Supreme Court noted that the rule articulated by *Albers* ordinarily imposed inverse condemnation liability without fault for damages caused by public improvements, but that *Albers* had exempted from its strict liability rule those types of cases in which the state had at common law a "right to inflict damage" (the so-called *Archer* line of cases). (*Albers v. County of Los Angeles, supra,* 62 Cal.2d 250.) The common law, in the "unique province of water law," conferred on a private landowner an absolute privilege to erect defensive barriers to protect his property from floodwaters even though it caused lower landowners damage because of increased volumes or velocities of floodwaters. (*Belair, supra,* 47 Cal.3d at pp. 563-564.) The issue in *Belair* was whether the state should enjoy the same absolute privilege. The *Belair* court concluded:

"Although, as noted, we expressly excepted the *Archer* [*Archer v. City of Los Angeles* (1941) 19 Cal.2d 19 [119 P.2d 1]] line of decisions from *Albers's* rule of liability without fault, we also cautioned against the 'facile' assumption that an activity which is 'privileged' when performed by a private party is equally privileged when undertaken by a public entity. (*Holtz v. Superior Court, supra,* 3 Cal.3d at pp. 307-308, fn. 13.) Different policy considerations, we noted, inform the public and the private spheres. . . .

"Thus, while we recognized in *Albers* that strict inverse condemnation liability may not be appropriate in the case of flood control improvements, we emphasized in *Holtz* that such improvements should not be cloaked with the same immunity as private flood control measures. The question, therefore, is *what* standard applies in such cases. We draw the answer from prior case law, public policy and common sense.

"On the one hand, a public agency that undertakes to construct or operate a flood control project clearly must not be made the absolute insurer of those lands provided protection. On the other hand, the damage potential of a defective public flood control project is clearly enormous. Therefore, as we observed in *Holtz*, the courts have consistently held that 'even when a public agency is engaged in such "privileged activity" as the construction of

[8]One rationale underlying the decisions in the trial court and the Court of Appeal was that there was no evidence the levee was the proximate cause of plaintiffs' damages. The Supreme Court rejected the conclusion on causation because the evidence supported plaintiffs' contention the levee did not function within its design capacity and thus constituted a substantial concurrent cause of their property damages. (*Belair, supra,* 47 Cal.3d at pp. 558-562.)

barriers to protect against floodwaters, *it must [at least] act reasonably and non-negligently.* [Citations.]' (*Holtz* v. *Superior Court, supra,* 3 Cal.3d at p. 307, fn. 12, italics added; . . . .) Contrary to plaintiffs' position, the fact that a dam bursts or a levee fails is not sufficient, standing alone, to impose liability. However, where the public agency's design, construction or maintenance of a flood control project is shown to have posed an unreasonable risk of harm to the plaintiffs, and such unreasonable design, construction or maintenance constituted a substantial cause of the damages, plaintiffs may recover regardless of the fact that the project's purpose is to contain the 'common enemy' of floodwaters. [Citations.]" (*Belair, supra,* 47 Cal.3d at pp. 564-565.)

Thus, *Belair* concluded that when a public flood control improvement does not function as intended and proximately causes damage to properties historically subject to flooding, the public entity does not have absolute immunity as did private parties at common law. However, the property owners may not recover in inverse condemnation from the public entity absent proof that the failure was attributable to some unreasonable conduct on the part of the public entity.

Six years after *Belair,* the court in *Locklin* v. *City of Lafayette* (1994) 7 Cal.4th 327 [27 Cal.Rptr.2d 613, 867 P.2d 724] extended the *Belair* analysis to property owners along a natural watercourse. The *Locklin* plaintiffs owned properties along a creek that suffered damages because the public entity's actions or improvements contributed to increased volume and velocity of water in the creek above the natural volume and velocity, and this increased volume and velocity were substantial factors in causing damage to the plaintiffs' properties. One issue was whether the so-called natural watercourse rule[9] insulated the public entity defendants from inverse condemnation liability. *Locklin* held that, although it was error to find for the defendants on the basis that the natural watercourse rule insulated defendants from inverse condemnation liability, the watercourse had not itself become a public improvement at the time the damage occurred and no public improvements in the creekbed contributed to the damage. *Locklin* held that *Archer* no longer correctly stated the principles applicable to the liability of riparian landowners, and that the correct rule is that when alterations or improvements on upstream property cause discharge of an increased volume or

[9]At common law, the natural watercourse rule had two aspects. It first permitted the riparian landowner to gather surface waters and discharge them into the watercourse at a location other than that at which natural drainage would occur. It also permitted the owner to make improvements in the bed of the stream to improve drainage and to protect the land from erosion by constructing dikes or embankments. Both types of activity were privileged even though the result would be to increase the volume and velocity that might damage the property of lower riparian owners. (*Locklin* v. *City of Lafayette, supra,* 7 Cal.4th at pp. 349-351.)

velocity of surface water into a natural watercourse that causes downstream property damage, a public entity may be liable for that damage. However, a public entity may be liable under the principles of inverse condemnation for downstream damage caused by an increased volume or velocity of surface waters discharged into a natural watercourse by a public improvement only if it does not use reasonably available, less injurious alternatives, or if it has incorporated the watercourse into a public drainage system or otherwise converted the watercourse itself into a public project. (*Locklin, supra,* at pp. 359-374.)

Finally, in *Bunch, supra,* 15 Cal.4th 432, the plaintiffs' inverse condemnation action against a local water district sought compensation for flood damage to the plaintiffs' property suffered when the district's improvements, designed to divert water from a potentially dangerous natural watercourse, failed in a severe storm. The issue was whether the reasonableness rule of *Belair* and *Locklin,* developed in the context of flood control improvements along natural watercourses, should apply to cases in which a public entity diverts and rechannels water under a flood control system that fails in a severe rainstorm and causes damage to properties historically subject to flooding. The plaintiffs argued the reasonableness rule should not apply because both *Belair* and *Locklin* limited their application to conduct that would have been privileged under the common law *Archer* "common enemy" exception, and the diversion of waters from their natural course was not a privileged activity before *Belair.* Accordingly, argued the plaintiffs, the public entity should be strictly liable under the *Albers* rule for the damage its flood control project caused. (*Bunch, supra,* at p. 447.) *Bunch* concluded that a public entity is subject to inverse condemnation liability under the reasonableness rather than the strict liability standard when a public flood control project that rechannels water from natural watercourses causes damage to properties historically subject to flooding. *Bunch* reasoned that this reasonableness approach furthers the policies underlying the common enemy cases: it does not discourage beneficial flood control projects by making the government an insurer against flood damage, and yet compensates injured property owners who otherwise would be required to contribute a disproportionate share of the cost of the project. (*Id.* at pp. 448-450.)

### 2. *Analysis*

City argues the strict liability approach set forth in *McMahan's* has been supplanted by the reasonableness test articulated in *Belair, Locklin* and *Bunch,* and is applicable to Pacific Bell's claim. City notes that both *Bunch* and *Belair* referred to numerous cases, including *McMahan's,* as setting forth a rule that applies strict inverse condemnation liability to public improvements that divert water from its natural drainage channel and cause damage.

(*Belair, supra*, 47 Cal.3d at p. 566; *Bunch, supra*, 15 Cal.4th at pp. 447-448.) City argues that *Bunch*'s decision to replace the strict liability standard with a reasonableness standard overruled the entire line of cited cases, including *McMahan's*, applying the strict liability standard, and therefore in cases with factual patterns analogous to *McMahan's* an inverse condemnation claim must be evaluated under the reasonableness test.

Although *Belair*, *Locklin* and *Bunch* replaced the strict liability approach with a reasonableness requirement for flood control improvements, we do not perceive those cases to have overruled *McMahan's*. *McMahan's* did not involve a failure of a flood control improvement causing damage to a property that was historically subject to flooding. Furthermore, the ratio decidendi of *Belair*, *Locklin* and *Bunch* does not support extension of the reasonableness standard here. The *Belair*, *Locklin* and *Bunch* approach was decided in the narrow and unique context of water law, and holds that neither the common law absolute immunity rule formerly applicable to damages caused by private flood protection measures, nor the strict liability rule applicable to damages caused by public improvements, appropriately balanced the competing interests.

In the present context, damages caused by failure of a private water pipe system would not have enjoyed absolute immunity at common law. More importantly, the concerns that animated the rejection of the strict liability rule in the context of public flood control projects has no counterpart here. *Belair*, *Locklin* and *Bunch* reasoned that strict liability for failure of a public flood control improvement would make the public entity an insurer against floods; the potentially enormous exposure could deter the public entity from building flood control projects and thereby deprive the public as a whole, including the damaged landowner, of protection against flooding. Because the landowner would suffer some flood damage in the absence of the flood control project or if the constructed project failed, the principle requiring compensation if the damaged landowner bore a disproportionate cost of the public benefit did not require a strict liability approach; instead, compensation was required only if the project exposed him to an unreasonable risk of harm. (*Bunch, supra*, 15 Cal.4th at pp. 450-451.)

Unlike flood control improvements, the purpose of a water delivery system is not to protect against the very injury that its failure caused. Unlike flood control improvements, failure of the pipe here subjected Pacific Bell's facility to injury from flooding that was not a risk it was exposed to in the

absence of the pipe.[10] Thus, the private landowner damaged by failure of the pipe, if left uncompensated, is forced to contribute a disproportionate share of the public undertaking. Because damages caused by failure of a water delivery system do not resemble damages caused by failure of a flood control system, we conclude the *Belair, Locklin* and *Bunch* reasonableness test should not be extended to the facts of this case, and the ordinary rules of inverse condemnation strict liability for damages caused by public improvements are applicable.

## DISPOSITION

The judgment is reversed. Respondent shall bear the costs of appeal.

Huffman, Acting P. J., and Haller, J., concurred.

---

[10]The court in *Akins v. State of California* (1998) 61 Cal.App.4th 1 [71 Cal.Rptr.2d 314] refused to apply *Bunch*'s reasonableness standard when the property was damaged by a risk created by the public work rather than by nature, and the flooding damaged a property not historically subjected to the risk of flooding.