Filed 2/10/15  Kelly v. Contra Costa Water Dist. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| BYRON KELLY et al.,<br><br>      Plaintiffs and Appellants,<br><br>v.<br><br>CONTRA COSTA WATER DISTRICT,<br><br>      Defendant and Respondent. | A139207<br><br>(Contra Costa County<br>Super. Ct. No. MSC10-01388) |

Plaintiffs Byron Kelly and Wayne Kelly filed a civil action against defendant Contra Costa Water District (District) after a leak in a District water pipe damaged their real property.  A jury awarded them damages under a cause of action for trespass, but the trial court entered judgment in favor of District on their claim for inverse condemnation.  Plaintiffs argue they were entitled to judgment in their favor on the inverse condemnation claim.  We disagree and affirm.

FACTS AND PROCEDURAL HISTORY

Plaintiffs, who are brothers, own and operate Stormaster, a self-storage facility located in Pittsburg, California.  Plaintiff Byron Kelly, a licensed contractor, was involved in the development of the property in the 1990's though he was not the builder.  The Stormaster property consists of 415 storage units housed in eight buildings, designated "A" through "H," as well as a manager's office and residence.  The storage units are built on cement slabs, and portions of them are built on fill.

1

District distributes water from the Contra Costa Canal through a series of 16 lateral pipes. A portion of a 15-inch cement water main known as Lateral 14 (which was originally constructed by the federal Department of the Interior but is now operated and maintained by District) runs under the Stormaster property.

In September of 2004, Peter Mom, the resident property manager of Stormaster, noticed water ponding in a flower garden on the property. Mom contacted the City of Pittsburg and, after learning its water department did not have pipes in the area, contacted District in December 2004 to report a possible leak.

Michael Bartzi, who worked in District's Operations and Maintenance Department, was assigned to be the supervisor on the reported leak. He first inspected the property in December 2004 and found a wet spot in the garden. Though he returned several times it was not until February 2005 that he was able to collect enough water for the testing necessary to determine its source. On February 28, 2005, after sufficient water was collected and testing confirmed it came from a District pipe, a District crew removed a section of the Stormaster parking lot and used a backhoe to try to excavate Lateral 14 and find the leak. The crew did not locate the pipe because additional fill had been added to the site, which was not reflected in the plans, and when they tried to reach down farther by probing a piece of rebar into the earth with the backhoe, that effort was also unsuccessful. Bartzi described the dirt in the excavation as a "clean scoop," not wet and muddy as he would expect with a break in a water main.

Bartzi obtained estimates from outside contractors to locate the leak, but these bids were rejected because they were too open ended. In May 2005, District installed a French drain in the flower garden because Mom was concerned about the water being a breeding ground for mosquitoes carrying West Nile virus.

In September 2006, District opened Lateral 14 at a different location and conducted a video inspection of the pipe's interior to find and determine the cause of the leak. District's principal civil engineer, Dan Owre, did not see a hole in the pipe, but noted a two-inch indentation he could not explain. Owre believed that if this indentation had been a hole, the water would have piped through to the surface of the ground and it

2

would have been easy to locate the leak. He assessed the leak as small and intermittent, and believed it probably came from a mortared joint in the pipe. Because the leak did not appear to be causing damage to the property, District concluded the repair did not need to be performed on an emergency basis, and it was deferred until 2008, when the leak was repaired by sliplining a 172-foot section of the pipe with gasket material.

Meanwhile, a crack developed in the concrete slab running under four of the storage buildings. Mom first observed a one-quarter-inch crack in one of the storage units in February 2006, having been awakened the previous night by the sound of the crack opening up with such force that it threw gravel and concrete against the metal roof. The crack eventually extended along the length of Buildings A and D and a portion of the slab under Buildings G and H.

Plaintiffs obtained bids to repair the cracks in the slab and the resultant damage. The geotechnical firms initially consulted concluded the buildings had settled. In 2008, geotechnical engineer Daniel Rhoades concluded the damage had actually been caused by the water leaking from Lateral 14, which had traveled to that area of the property via an old road that had since been buried.

Plaintiffs filed a complaint against District in May 2010, which included causes of action for inverse condemnation, maintaining a dangerous condition of property, nuisance and trespass. The tort claims were tried to a jury and the inverse condemnation claim was tried to the court in a unified proceeding. After the evidence was complete, District submitted points and authorities to the court arguing plaintiffs had failed to establish the elements of an inverse condemnation claim. The remaining causes of action were submitted to the jury, which returned a verdict finding District liable on the trespass cause of action and awarded damages of $414,000 based on repair costs. The jury further determined plaintiffs and/or their partners and agents were negligent or at fault at the time the property was constructed, and assessed plaintiffs' percentage of fault at 20 percent.

The trial court took the inverse condemnation claim under submission and filed an order on May 8, 2013, purporting to grant a directed verdict in favor of District on that cause of action. Plaintiffs appealed from the court's order, and the court later entered

3

judgment in conformity with the jury's verdict and the court's decision on the inverse condemnation claim.[1]

## DISCUSSION

Plaintiffs do not contest any aspect of the jury's verdict, but argue the trial court erred when it ruled in favor of District on their cause of action for inverse condemnation. They claim the court should have found District was liable under an inverse condemnation theory, because the evidence established their property was damaged for a public use. We disagree.[2]

A. *Standard of Review and Procedural Issues*

Because it affects the standard of review on appeal, we consider the nature of the trial court's order rejecting the inverse condemnation claim, which states: "Defendant[] Contra Costa Water District's Motion for a Directed Verdict re: Inverse Condemnation is GRANTED. Plaintiffs[] have not established a prima faci[e] case for Inverse Condemnation. [Citations.]" The order was a response to District's Memorandum of Points and Authorities in Support of Motion for Failure to Establish Inverse Condemnation, which was filed at the close of both parties' evidence and in which District argued plaintiffs had failed to establish the elements of inverse condemnation.

Although the trial court's order was framed as one granting a directed verdict, the directed verdict procedure is only available in a jury trial and was not an appropriate vehicle for resolving an issue that was tried to the court. (Code Civ. Proc., § 630.) While we could view the order as one granting a motion for judgment under Code of Civil

---

[1] Although the appeal was taken from the court's order filed on May 8, 2013, we construe it as having been taken from the final judgment, which was entered on August 9, 2013. When a notice of appeal is prematurely filed before the entry of a final appealable judgment or order, "the reviewing court may treat the notice as filed immediately after the rendition of judgment or the making of the order." (Cal. Rules of Court, rule 8.406(d); see *Margolin v. Shemaria* (2000) 85 Cal.App.4th 891, 893, fn. 1.)

[2] A favorable verdict on the inverse condemnation claim would have entitled plaintiffs to a judgment that included attorney fees, in addition to the repair costs awarded as damages under the trespass cause of action. (Code Civ. Proc., § 1036.)

Procedure section 631.8, a procedure that serves the function of a nonsuit or motion for directed verdict in court trials, such motions are generally brought by a defendant at the close of the plaintiff's evidence, the purpose of the motion being to dispense with the need for the defendant to produce evidence when the plaintiff has failed to carry the burden of proof. (See *Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 314, fn. 23; *Allegretti & Co. v. County of Imperial* (2006) 138 Cal.App.4th 1261, 1269 [court granted defendant's motion for judgment under Code Civ. Proc., § 631.8 after plaintiff's close of evidence in liability phase of inverse condemnation case].)

We think it is appropriate to characterize the court's order as its decision on the merits of the inverse condemnation claim, rather than a ruling on a motion. The parties had rested and the court had before it all the evidence presented by both sides when it issued the order. The points and authorities filed by District were orally opposed by plaintiffs before the case was taken under submission, and the parties provided the court with a thorough analysis of the merits of their positions. The court's order spoke in terms of plaintiffs' failure to make a "prima faci[e] case" of inverse condemnation, but in context, this meant they had not satisfied their burden of proof and were not entitled to prevail.

Having concluded the challenged order is a decision by the trial court on the merits of the inverse condemnation claim, we apply the standard of review applicable to such a decision. Whether the actions of District constituted a taking of plaintiffs' property, as required for a claim of inverse condemnation, is a mixed question of law and fact. (*Ali v. City of Los Angeles* (1999) 77 Cal.App.4th 246, 250.) "Mixed questions of law and fact involve three steps: (1) the determination of the historical facts—what happened; (2) selection of the applicable legal principles; and (3) application of those legal principles to the facts. The first step involves factual questions exclusively for the trial court to determine; these are subject to substantial evidence review; the appellate court must view the evidence in the light most favorable to the judgment and the findings, express or implied, of the trial court. [Citations.]" (*Ibid.*) The second and third steps of the inquiry involve questions of law and are reviewed de novo. (*Ibid.*)

5

When, as here, the party with the burden of proof argues the evidence compelled a finding in his or her favor, our task as a reviewing court is to determine whether the evidence compels such a finding as a matter of law. (*Valero v. Board of Retirement of Tulare County Employees' Assn.* (2012) 205 Cal.App.4th 960, 966 (*Valero*).) " 'Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Ibid.*, citing *Roesch v. De Mota* (1944) 24 Cal.2d 563, 571; see *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466.)

Because the trial court in this case did not issue a statement of decision under Code of Civil Procedure section 632, we apply the doctrine of implied findings and presume the trial court made all the factual findings necessary to support its judgment that are supported by substantial evidence. (*Acquire II, Ltd. v. Colton Real Estate Group* (2013) 213 Cal.App.4th 959, 970; *Fair v. Bakhtiari* (2011) 195 Cal.App.4th 1135, 1148, fn. 11.) The doctrine of implied findings "is a natural and logical corollary to three fundamental principles of appellate review: (1) a judgment is presumed correct; (2) all intendments and presumptions are indulged in favor of correctness; and (3) the appellant bears the burden of providing an adequate record affirmatively proving error." (*Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 58.)

Plaintiffs assert the doctrine of implied findings does not apply because they requested, but did not receive, a statement of decision under Code of Civil Procedure section 632, which provides in relevant part: "In superior courts, upon the trial of a question of fact by the court, written findings of fact and conclusions of law shall not be required. The court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial. The request must be made within 10 days after the court announces a tentative decision . . . ." The record does not support plaintiffs' characterization of the proceedings.

6

After the jury returned its verdict, the court suggested it would take the inverse condemnation claim under submission and issue a written ruling. Counsel for District commented, "Since there is some research involved and [the court] wouldn't be quite as rushed, I have no problem, you know, with some type of Statement of Decision or ruling." The court confirmed it would put its ruling in writing and stated, "If you want to argue it further after you get it, then let us know, and I'll put it on calendar," a procedure to which both sides agreed. In light of the court's offer to set the matter for a further hearing at any party's request, the order it filed on May 8, 2013, is properly viewed as a tentative opinion within the meaning of Code of Civil Procedure section 632. Plaintiffs did not request a statement of decision after the order was filed, forfeiting their rights to such a statement. (*Amerco Real Estate Co. v. City of West Sacramento* (2014) 224 Cal.App.4th 778, 789, fn. 2; Code Civ. Proc., § 632.)[3]

B. *Inverse Condemnation*

Turning to the merits, an inverse condemnation action is an eminent domain action initiated by one whose property was taken or damaged for public use. (*Pacific Bell v. City of San Diego* (2000) 81 Cal.App.4th 596, 602 (*Pacific Bell*).) It is predicated on article I, section 19 of the California Constitution, which provides that private property may be taken or damaged for a public use only when damages have been paid to the owner. (See *ibid.*) "The fundamental policy underlying the concept of inverse condemnation is that the costs of a public improvement benefiting the community should be spread among those benefited rather than allocated to a single member of the community." (*Ibid.*) Liability for inverse condemnation is an issue for the trial court to resolve, with damages, if any, to be awarded by the jury. (*Marshall v. Department of Water & Power* (1990) 219 Cal.App.3d 1124, 1141.)

The law of inverse condemnation allows a property owner to recover just compensation from a public entity for "any actual physical injury to real property

_____

[3] Plaintiffs assert they sent a letter to the court reminding it of its offer to allow additional argument, but the record on appeal does not include such a document.

proximately caused by [a public] improvement as deliberately designed and constructed . . . whether foreseeable or not." (*Albers v. County of Los Angeles* (1965) 62 Cal.2d 250, 263-264.) "[This] requirement is satisfied by a public improvement that as designed and constructed presents inherent risks of damage to private property, and the inherent risks materialize and cause damage." (*Pacific Bell*, *supra*, 81 Cal.App.4th at p. 607.)

Because inverse condemnation requires a taking for a public use, it must be based upon a policy decision by the public agency, and not simply the negligent act of a public employee. (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 86-87 (*Paterno*).) A cause of action for inverse condemnation "is distinguished from, and cannot be predicated on, general tort liability or a claim of negligence in the maintenance of a public improvement." (*California State Automobile Assn. v. City of Palo Alto* (2006) 138 Cal.App.4th 474, 479.)

"In the case of alleged shoddy maintenance, as here, it is the *plan* of maintenance which must be unreasonable to establish a taking. Poor *execution* of a maintenance plan does not result in a taking." (*Paterno*, *supra*, 74 Cal.App.4th at p. 87.) "Damage resulting from negligence in the routine operation [of the public improvement] having no relation to the function of the project as conceived is not within the scope" of inverse condemnation. (*Ibid.*) " 'The destruction or damaging of property is sufficiently connected with 'public use' as required by the Constitution, if the injury is a result of dangers inherent in the construction of the public improvement as distinguished from dangers arising from the negligent operation of the improvement.' " (*Ibid.*)

The distinction between the dangers inherent in a public improvement and the dangers arising from negligent operation and maintenance of that improvement are illustrated by *Hayashi v. Alameda County Flood Control* (1959) 167 Cal.App.2d 584, in which claims for negligence and inverse condemnation were based on damages caused by a 60-foot break in a levee maintained by the local flood control agency along a creek. (*Id.* at pp. 585-586.) Though the agency was notified of the break, which occurred in December 1955, it made no repairs and the plaintiffs' greenhouse and plant growing operation was damaged by flooding in January 1956. (*Id.* at p. 586.) In an appeal from a

8

judgment of dismissal in favor of the agency after its demurrer was granted without leave to amend, the appellate court concluded the plaintiffs could proceed under a negligence theory, but had not stated a cause of action for inverse condemnation. (*Id*. at pp. 586, 591-592.) The court noted the distinction between "negligence which occurs when a public agency is carrying out a deliberate plan with regard to the construction of public works, and negligence resulting in damage growing out of the operation and maintenance of public works. . . . In the present case [the agency] did not cause the original break in the levee, nor is it charged that such occurred by reason of negligence. Negligent design or construction is not charged, nor did the [agency] deliberately divert the water onto the plaintiffs' lands. It is charged with negligent failure to act thereafter, that is, with negligence in the operation and maintenance of its property. In our opinion that does not charge a taking of property for public use under the Constitution." (*Id*. at pp. 591-592.)

Consistent with these principles, the trial court in this case could reasonably conclude the damage to plaintiffs' property was caused by the negligent maintenance of Lateral 14 by District employees, who failed to promptly locate and repair the leak once discovered, rather than by the design or construction of that pipe or the overall water delivery system. The cause of the leak was undetermined, and plaintiffs presented no evidence showing Lateral 14 was not properly designed or constructed. Although plaintiffs assert District maintained a faulty "wait until it leaks" maintenance plan designed to shift the burden of such leaks to property owners, the record shows that District employees conducted an annual visual inspection of the ground above the pipe to see whether there were signs of a leak (i.e., green grass in an otherwise dry and barren field), and that there was no practical way to routinely inspect the interior of the pipe. Even if District employees were negligent in failing to promptly locate and repair the leak once it was discovered, the trial court could reasonably determine the damage was not caused by a faulty maintenance *plan* approved and implemented by District. (Cf. *Pacific Bell*, *supra*, 81 Cal.App.4th at p. 600 [upholding inverse condemnation claim based on break in a cast-iron city water pipe; city was aware all such pipes needed to be replaced, but maintained a policy of waiting until a pipe broke before replacing it]; *McMahan's of*

9

*Santa Monica v. City of Santa Monica* (1983) 146 Cal.App.3d 683, 696, disapproved on other grounds in *Bunch v. Coachella Valley Water Dist.* (1997) 15 Cal.4th 432, 443 [damage caused by break in city-operated water main that had been in use 51 years despite an assumed lifetime of 40 years; maintenance program to replace pipes was itself inadequate].)

Plaintiffs' evidence was not uncontradicted and unimpeached, nor was it of such a nature that the court was compelled to find the damage from the leak was the result of a public project as deliberately designed, as opposed to the operation and maintenance of that project. (*Valero*, *supra*, 205 Cal.App.4th at p. 966.) Nor did it compel the conclusion District had deliberately shifted the risk of damage caused by leaky pipes to property owners as part of a maintenance program. (Cf. *Pacific Bell*, *supra*, 81 Cal.App.4th at p. 608.) Reversal is not required.

## DISPOSITION

The judgment is affirmed. Respondent is entitled to ordinary costs on appeal.

_____
NEEDHAM, J.

We concur.

_____
JONES, P. J.

_____
SIMONS, J.

10