[No. H021339. Sixth Dist. June 25, 2002.]

JAMES ARREOLA et al., Plaintiffs and Respondents, v.
COUNTY OF MONTEREY et al., Defendants and Appellants.

[And five other cases.*]

*Baeza v. County of Monterey (No. 106592); Calcote v. County of Monterey (No. 106782); Clint Miller Farms, Inc. v. County of Monterey (No. 106829); Phoenix Assurance Co. v. County of Monterey (No. 107040); Allendale Mutual Ins. Co. v. County of Monterey (No. 107041).

## COUNSEL

Lepper & Harrington, Gary M. Lepper, Matthew P. Harrington; and Samuel Torres, Jr., County Counsel, for Defendants and Appellants County of Santa Cruz and Santa Cruz County Flood Control and Water Conservation District.

Bruce A. Behrens, David Gossage, Janet Wong and Lucille Y. Baca for Defendant and Appellant State of California.

McDonough, Holland & Allen, Kronick, Moskovitz, Tiedemann & Girard, Mark A. Wasser, Andrew P. Pugno; and Adrienne M. Grover, County Counsel, for Defendants and Appellants County of Monterey and Monterey County Water Resources Agency.

Morrison & Foerster, James P. Bennett, George C. Harris, Andrew D. Muhlbach, John A. Pacheco; Law Offices of Haselton & Haselton, Joseph G. Haselton; Carlson, Calladine & Peterson, Randy W. Gimple; Johnson & James, Omar F. James and Robert K. Johnson for Plaintiffs and Respondents.

## OPINION

**PREMO, Acting P. J.**—Defendants, County of Santa Cruz, Santa Cruz County Flood Control and Water Conservation District (collectively Santa Cruz), Monterey County Water Resources Agency (MCWRA), and County of Monterey (Monterey), were found liable in tort and inverse condemnation for extensive damage caused when the Pajaro River Levee Project (the Project) failed during a heavy rainstorm in 1995. Defendant State of California (State) was also found liable in tort and inverse condemnation for damage caused when Highway 1 obstructed the path of the floodwater on its way to the sea. For reasons we shall explain, we affirm.

## A. INTRODUCTION

This action commenced with the filing of six different complaints on behalf of approximately 300 plaintiffs. The essence of plaintiffs' claims against Santa Cruz, MCWRA, and Monterey was that their failure to keep the Project channel clear diminished its capacity and ultimately caused a levee to fail during the storm. As against State, plaintiffs alleged that the drainage culverts under Highway 1 were too small to drain the flood and the resultant damming effect caused higher flood levels and destructive ponding of the floodwater.

The individual matters were consolidated, and the liability and damages phases were bifurcated for trial. The tort causes of action were tried to a jury. The inverse condemnation claims were simultaneously tried to the court. The jury found all defendants liable for dangerous condition of public property and nuisance. The counties and the water agencies were also found liable for negligence, and, with the exception of Monterey, for violation of mandatory duty. The trial court found all defendants liable on the inverse condemnation claims.

In order to obtain review of the liability issues prior to trial of the damages phase the parties selected Tony's Auto Center as a representative plaintiff and stipulated to damages as to that plaintiff only. Judgment in favor of Tony's Auto Center was filed January 6, 2000. The county and water agency defendants jointly moved for a new trial and that motion was denied. All defendants filed timely notice of appeal.[1]

## B. FACTS

### 1. *The Project*

The Pajaro River is formed by the union of several smaller tributaries in the Counties of San Benito and Santa Clara. It flows through Chittenden Pass in the Santa Cruz Mountains and emerges into the Pajaro Valley, eventually emptying into Monterey Bay. The river forms the border between the Counties of Santa Cruz on the north and Monterey on the south. The Pajaro Valley is an historic floodplain. Today, most of the valley is devoted to agriculture. Its two population centers are the City of Watsonville on the Santa Cruz side of the river, and the small town of Pajaro just across the river from Watsonville on the Monterey side.

---

[1]Although appeal is taken only from the judgment in favor of the single representative plaintiff, our decision is applicable to the entire action. The following discussion refers to "plaintiffs" as a reflection of that practical reality.

The federal Flood Control Act of 1944 (Pub.L. No. 78-534, ch. 665 (Dec. 22, 1944) 58 Stat. 887) authorized the United States Army Corps of Engineers (the Corps) to construct the Project upon receipt of assurances from the responsible local agencies that they would, among other things, operate and maintain the Project as the Corps required. The California Water Resources Act authorized the State's portion of the project and directed the four affected counties (Santa Clara, San Benito, Santa Cruz, and Monterey) to give the required written assurances. (Stats. 1945, ch. 1514, p. 2827.) Before the counties took any action, the California Legislature created the Monterey County Flood Control and Water Conservation District, and the new district replaced Monterey for purposes of the Water Resources Act. (Stats. 1947, ch. 699, §§ 2, 4, p. 1739.) MCWRA succeeded to the responsibilities of the Monterey County Flood Control and Water Conservation District in 1990. (Stats. 1990, ch. 1159, p. 4831.)

In 1947, the three counties and Monterey County Flood Control and Water Conservation District signed a resolution giving the assurances required by the federal Flood Control Act. Shortly thereafter, Monterey joined the other three counties in executing an indemnity agreement under which each county accepted responsibility for the portion of the Project located within its borders, and guaranteed as to each other the assurances that had been given to the Corps.

2. *Maintenance of the Project*

The Project design consisted primarily of clearing the river channel and constructing earthen levees along both sides of the river, beginning near Murphy's Crossing east of Watsonville and extending westward to the mouth of the river. The Corps completed the Project in 1949 and transferred responsibility for its maintenance to the local interests. The Corps provided an "Operation and Maintenance Manual" to guide maintenance efforts. One goal of maintenance was to maintain the Project's capacity. Federal regulations, which were incorporated into the manual, specified that the channel be kept clear of shoals, weeds and wild growth. (See 33 C.F.R. § 208.10(g)(1) (2001).) Vegetation and shoals in the channel decrease its capacity. Therefore, it was important to keep the channel clear in order to maintain the capacity it was intended to have.

The Corps had designed the Project to have a capacity of 19,000 cubic feet per second (c.f.s.). The Corps' 1946 "Definite Project Report" stated that the Project would be built to "contain a two-per-cent-chance flood within a 3-foot freeboard." The "freeboard" to which the report refers is the distance from the top of the levee to the surface of the water at the level the project

is designed to carry. Freeboard is included as a safety feature. It provides additional capacity to take care of unforeseen factors, although it is not intended to contain water for long periods of time. The Corps' report explained: "The channel capacity will be 19,000 c.f.s. above the mouth of Corralitos Creek [the point at which the Project failed in 1995] . . . ."[2] The Corps' documents pointed out that by encroaching on the freeboard the Project would hold 23,000 c.f.s. at the pertinent location and still have one foot of freeboard remaining. That means that the Project was designed to contain 19,000 c.f.s. at the point at which the Project ultimately failed, and, if unaccounted factors had not diminished the channel's capacity, there would still be room to safely carry, at least for a short period of time, an additional 4,000 c.f.s.

From 1949 until 1972, the vegetation and sandbars were removed with a tractor and a bulldozer. The effectiveness of these channel clearing efforts was demonstrated by the Project's performance during two storms in the 1950's. In a 1955 storm, the Chittenden[3] gauge reported flows of 24,000 c.f.s. Even with such a high flow there remained over two feet of freeboard near the point where the levee failed in 1995. In 1958 the Project contained flows of 23,500 c.f.s., although with slightly less freeboard remaining.

The continuous mechanized clearing of the channel stopped around 1972. The California Department of Fish and Game (Fish and Game) had demanded a halt to mechanical clearing of the channel in order to protect the riparian habitat. In an apparent attempt to conform to both the demands of Fish and Game and the Corps' Project maintenance requirements, Santa Cruz began using herbicides to kill the vegetation in the channel. Without regular mechanized clearing, however, vegetation and sandbars built up, impeding the flow of winter runoff. As the Project deteriorated, it reverted more and more to riparian habitat, which in turn encouraged the claim of Fish and Game to jurisdiction over the Project. Although Fish and Game had procedures by which the local agencies could appeal the department's decisions, the local agencies never appealed.

In addition to Fish and Game, local environmental interests made thorough maintenance of the channel more challenging by actively supporting efforts to preserve the river's habitat. In 1976, Supervisor Gary Patton wrote

[2]Corralitos Creek is also known as Salsipuedes Creek. It joins the Pajaro River just east of the City of Watsonville.

[3]The Chittenden gauge, which is located on the river several miles east of the Project, continuously measures the depth of the water. Hydrologists periodically measure the width and velocity of the stream. By graphing the periodic measurements they can estimate the volume of the discharge at any given depth. The data from the Chittenden gauge is used to estimate the water flow further down the river in the Project channel.

to the Legislature on behalf of the Santa Cruz County Board of Supervisors to support Fish and Game policies and to encourage strong legislation to protect river habitat and regulate streambed alteration. In 1977, Santa Cruz adopted an ordinance designed to "preserve, protect and restore riparian corridors." In 1980, the county fish and game commission was given authority to restore fishery habitat in the Pajaro River, and to review public works projects that involved any alteration of the streambed or of streamside vegetation.

As the channel became more clogged, thorough clearing became more expensive. The passage of Proposition 13 in 1978 made funding more of a problem in general so that through the 1980's the Santa Cruz County Department of Public Works did not have funds to remove trees and other vegetation in the channel. MCWRA[4] had no significant funds to participate in channel clearing efforts, and since 1974 had concentrated almost exclusively on levee maintenance. Although Supervisor Marc Del Piero asked his colleagues several times to approve allocations to MCWRA from Monterey's general fund, with one minor exception, he was never successful.

The presence of vegetation and sandbars within the channel proliferated and posed an acknowledged risk of flooding. By 1977 area farmers had become concerned about the lack of mechanized clearing and expressed their concerns to supervisors in both counties. Watsonville officials wrote to the Santa Cruz County Department of Public Works in 1985, 1987 and 1988, asking that something be done. The agencies responsible for Project maintenance were also worried about the condition of the channel. By 1988, Joseph Madruga, chief engineer for MCWRA, had come to the conclusion that vegetation and sandbars in the channel had reduced its capacity by at least 50 percent. John Fantham, director of the Santa Cruz County Department of Public Works, had recognized the risk of flooding as early as 1983. Later, both agencies acknowledged that the 1995 flood was due in substantial part to the failure to clear the channel.

Meanwhile, the Corps had been performing inspections of the Project about twice a year. Although the Corps issued only one notice that the Project was in an unacceptable condition, the majority of the semiannual evaluations expressed concern that dense vegetation in the channel posed a serious constriction on the flow. Many of the Corps' evaluations included notice to both the MCWRA board and the Santa Cruz County Board of

---

[4]Unless the context requires a distinction, we shall hereafter refer to MCWRA and its predecessor, Monterey County Flood Control and Water Conservation District, simply as MCWRA.

Supervisors that lack of maintenance could disqualify the Project for future federal assistance in the event of a flood. The Corps actually did temporarily disqualify the Project for that reason in 1992.

By 1988, the issue had come to the attention of Congressman Leon Panetta. Congressman Panetta convened the Pajaro River Task Force to determine what was to be done about the conflicting concerns of flood control and habitat restoration. The task force was made up of representatives from all the responsible and affected agencies, Fish and Game, and the Corps. Supervisor Del Piero and Mr. Madruga represented the Monterey interests. Mr. Fantham and Supervisor Robley Levy represented Santa Cruz. After over two years of work, the task force produced the "Pajaro River Corridor Management Plan," which called for the hand clearing of vegetation. Both Mr. Fantham and Mr. Madruga felt that the plan was inadequate, and would do no more than maintain the status quo. Mr. Madruga voiced his objection at the task force meeting and in a letter to Mr. Fantham in which he advocated a program of thinning and removal of selected vegetation using heavy equipment. According to Mr. Madruga, this was the "only method that can accomplish the flood protection necessary to protect the citizens of the Pajaro Valley at a reasonable cost and in a reasonable time frame." Notwithstanding these reservations, the task force unanimously approved the plan in October 1991, although there is no evidence it was ever formally adopted by the agencies charged with implementing it.

Finally, beginning in the early 1990's, the agencies on both sides of the river began more aggressive efforts to clear the channel. In 1991, at the urging of Supervisor Del Piero, MCWRA applied for a permit to use a backhoe and bulldozer to clear the channel. Fish and Game issued the permit, but limited its permission to hand clearing and then later halted the work. In 1993, at the invitation of area farmers, then Director of Fish and Game, Boyd Gibbons toured the Project. Gibbons was sufficiently concerned with the condition of the channel that he instructed his staff to work with the counties to get the necessary work done as soon as possible. Thereafter, Santa Cruz obtained permits to do some mechanized clearing of the channel. However, the work that was done was not enough to entirely clear the vegetation and sediment that had been allowed to collect over the preceding 20 years.

3. *Highway 1*

Highway 1 runs north to south and crosses the Pajaro River at the lower end of the Pajaro Valley, west of Watsonville. State began planning the construction of the subject portion of the highway in the 1950's. At the time,

Highway 1 ran through Watsonville. The new section was to bypass the city. The bypass required the construction of a new bridge over the river and an earthen embankment elevating the highway at the south end of the bridge. Trafton Road today runs under Highway 1 on the southern side of the river. Before State built the bypass, water passed through this area along a path in the vicinity of Trafton Road. The planned embankment would obstruct the existing drainage in that area. To compensate, State needed to design a drainage system for the embankment.

Investigation, design and construction of the embankment continued through the late 1960's. State's design criteria required that drainage through embankments be able to discharge a 100-year flood without causing water to back up over adjacent private property. State's engineers explained that this criterion did not require the drainage system in this case to accommodate flows escaping from the Project channel. According to State, the drainage needed only to pass rainwater runoff from a 700-acre area immediately adjacent to the highway. Using those guidelines, State engineers approved plans for two 48-inch culverts that could accommodate 98 c.f.s. The design documents showed that this design actually anticipated that "[s]hallow flooding on peak flow can be expected for some distance outside the [right of way]."

### 4. *The Flood*

The Project protected the valley for over 45 years until the storm of March 1995. On the night of March 10-11, 1995, the river overtopped the levee on the Monterey side, upriver from its junction with Corralitos (Salsipuedes) Creek. The resultant rush of water over the levee eroded the back side of the levee and it gave way, inundating the surrounding valley.

The vegetation and sediment that had been allowed to accumulate in the channel caused the river flow to be higher than it would have been had it been properly cleared. On the night of the storm, the maximum flow at the Chittenden gauge was estimated to have been 21,300 c.f.s. Plaintiffs' expert, Dr. Robert Curry, testified that in his opinion the 21,300 c.f.s. overestimated the flow because it did not take into account a number of factors taking place within the channel or downriver from the gauge. According to Dr. Curry, these factors served to reduce the actual flow at the break site to 16,000 to 18,500 c.f.s., most likely around 17,500 c.f.s.

When the levee failed, the floodwaters ran onto the historically flooded valley floor until they reached the Highway 1 embankment. The Highway 1 culverts were quickly overwhelmed, so that the water backed up on the east

side of the highway, flooding more acreage than it otherwise would have flooded, and standing in many places for an extended period of time. The standing water exacerbated the flood damage because it caused the deposition of vast amounts of destructive sediment, all of which had to be removed when the floodwaters finally receded.

## C. Discussion

### 1. *Summary of Issues and Scope of Review*

The two counties and their related water agencies contend: (1) the trial court did not make the determination of unreasonableness that is necessary to support inverse condemnation liability, (2) inverse condemnation liability may not be based on shoddy maintenance of a public improvement, (3) the trial court used an erroneous definition of the Project's "design capacity," (4) there was insufficient evidence to support a finding that the Project did not perform within its capacity, and (5) the trial court erred in adopting the plaintiffs' proposed statement of decision.

MCWRA separately contends that the trial court erred in failing to apportion among the defendants the damages of the single plaintiff, Tony's Auto Center. Since MCWRA stipulated to the judgment in the form it was entered, MCWRA is estopped to complain of error, if any there was. (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 420 [185 Cal.Rptr. 654, 650 P.2d 1171].)

State contends: (1) the trial court applied an improper standard of unreasonableness in ruling on the inverse condemnation claim, (2) State could not be liable in tort because it had no duty to protect plaintiffs from failure of the Project, (3) State is immune from tort liability under Government Code section 830.6 (design immunity), and (4) the breach of the levee was a superseding cause.

Monterey argues separately that it is not liable because it did not have any responsibility for the Project.

Except where noted, defendants' arguments relate to facts that are materially undisputed. We therefore apply our independent review. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960].)

### 2. *Inverse Condemnation—Legal Background*

"Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." (Cal. Const., art. I, § 19, hereafter article I, section 19.) When a public use results in damage to private property without having been preceded by just compensation, the property owner may proceed against the public entity to recover it. Such a cause of action is

denominated "inverse condemnation." (*Breidert v. Southern Pac. Co.* (1964) 61 Cal.2d 659, 663, fn. 1 [39 Cal.Rptr. 903, 394 P.2d 719].)

Early inverse condemnation cases presumed that article I, section 19 (then § 14) merely provided an exception to the general rule of governmental immunity and that a public entity could only be liable in inverse condemnation if a private party could be held liable for the same injury. (*Archer v. City of Los Angeles* (1941) 19 Cal.2d 19, 24 [119 P.2d 1] (*Archer*).) *Albers v. County of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129] (*Albers*) explained that the constitutional provision actually provided a broader basis for governmental liability. *Albers* confirmed that the fundamental policy basis for the constitutional requirement of just compensation is a consideration of " 'whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking.' " (*Id.* at p. 262.) According to *Albers*, "any actual physical injury to real property proximately caused by [a public] improvement as deliberately designed and constructed is compensable under [article I, section 19] of our Constitution whether foreseeable or not." (*Id.* at pp. 263-264.) The only limits to the claim were that (1) the injuries must be physical injuries of real property, and (2) the injuries must have been proximately caused by the public improvement as deliberately constructed and planned. (*Holtz v. Superior Court* (1970) 3 Cal.3d 296, 304 [90 Cal.Rptr. 345, 475 P.2d 441] (*Holtz*).)

█ Although *Albers* had held that the inverse condemnation plaintiff was entitled to compensation without regard to fault, *Albers* left open two exceptions to that rule—the *Gray* exception, which is not pertinent here, and the *Archer* exception. (*Albers, supra,* 62 Cal.2d at p. 263; and see *Gray v. Reclamation District No. 1500* (1917) 174 Cal. 622 [163 P. 1024]; *Archer, supra,* 19 Cal.2d at p. 24.) In brief, the so-called *Archer* exception involved the circumstances, peculiar to water law, in which a landowner had a right to inflict damage upon the property of others for the purpose of protecting his or her own property. Such circumstances included the erection of flood control measures (the common enemy doctrine) and the discharge of surface water into a natural watercourse (the natural watercourse rule). Under private water law analysis, these rules immunized the landowner from liability for resulting damage to downstream property. (See *Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 563-564 [253 Cal.Rptr. 693, 764 P.2d 1070] (*Belair*); *Archer, supra,* 19 Cal.2d at pp. 24-26; *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 350 [27 Cal.Rptr.2d 613, 867 P.2d 724] (*Locklin*).) Presumably, under the *Archer* exception, a public entity would be completely immune from liability if the entity's conduct were of the type that would have been immune under these water law principles.

Like this case, *Belair* involved flood damage that occurred after a levee failed. *Belair* modified *Albers* and adopted a rule of reasonableness to be

applied in the context of flood control litigation. *Belair* determined that application of the *Albers* rule of strict liability would discourage needed flood control projects by making the entity the insurer of the property the project was designed to protect. (*Belair, supra,* 47 Cal.3d at p. 565.) On the other hand, to apply the *Archer* exception would unfairly burden the private landowner by requiring the landowner to bear a disproportionate share of the damage caused by failure of the public project. To balance these conflicting concerns *Belair* held: "[W]here the public agency's design, construction or maintenance of a flood control project is shown to have posed an unreasonable risk of harm to the plaintiffs, and such unreasonable design, construction or maintenance constituted a substantial cause of the damages, plaintiffs may recover regardless of the fact that the project's purpose is to contain the 'common enemy' of floodwaters." (*Ibid.*) Under *Belair,* the public entity is not immune from suit, but neither is it strictly liable.

*Belair* left open the question of how to determine reasonableness in the inverse condemnation context. That question was answered in *Locklin.* The *Locklin* plaintiffs had alleged that increased runoff from creek side public works caused erosion damage to their property downstream. *Locklin* held that the privilege to discharge surface water into a natural watercourse (the natural watercourse rule) was a conditional privilege, subject to the *Belair* rule of reasonableness. ▋ *Locklin* explained that to determine reasonableness in such a case, the trial court must consider what are now commonly referred to as the "*Locklin* factors." They are: "(1) [t]he overall public purpose being served by the improvement project; (2) the degree to which the plaintiff's loss is offset by reciprocal benefits; (3) the availability to the public entity of feasible alternatives with lower risks; (4) the severity of the plaintiff's damage in relation to risk-bearing capabilities; (5) the extent to which damage of the kind the plaintiff sustained is generally considered as a normal risk of land ownership; and (6) the degree to which similar damage is distributed at large over other beneficiaries of the project or is peculiar only to the plaintiff." (*Locklin, supra,* 7 Cal.4th at pp. 368-369.)

Thus, in matters involving flood control projects, or in circumstances such as those before the court in *Locklin,* the public entity will be liable in inverse condemnation if its design, construction, or maintenance of a public improvement poses an unreasonable risk of harm to the plaintiff's property, and the unreasonable aspect of the improvement is a substantial cause of damage. In those circumstances, unreasonableness is determined by balancing the factors set forth in *Locklin.*

### 3. Counties' Issues[5]

#### a. The Trial Court Properly Balanced the "Locklin Factors."

 Counties contend that the trial court did not analyze the reasonableness of their actions according to the requirements of *Locklin*. The plaintiffs' proposed statement of decision referred specifically to the six *Locklin* factors and the trial court's consideration of each of them. The trial court acknowledged that the balancing analysis in the proposed statement of decision was correct, but felt that the discussion was not necessary for a statement of decision and had it stricken. The trial court instead stated, "The Court has balanced the public need for flood control against the gravity of the harm caused by the unnecessary damage to the plaintiffs' property, and finds that the County defendants acted unreasonably. *See Belair*, [*supra*,] 47 Cal.3d at [at pp.] 566-67."

Counties brought the absence of the *Locklin* factors to the trial court's attention in connection with the hearing on the motion for new trial. Plaintiffs, therefore, moved to amend the statement of decision to include the previously stricken analysis. In response, the court ruled, "In fact, I did make those findings. And the reason for deleting them from the proposed statement was a disposition for brevity. I think they were there. I did consider them. I will grant the motion to insert them back into the statement of decision of the court for clarity." As permitted by Code of Civil Procedure section 662,[6] the trial court amended the statement of decision to include the *Locklin* analysis. We reproduce that portion in the margin.[7]

Counties now argue that the trial court came to a final decision without the necessary balancing and then merely plugged the hole by inserting the

---

[5]In this section we address the issues raised in briefs filed by Santa Cruz and MCWRA. Monterey joins the arguments raised in both briefs. To simplify our discussion, we shall refer in this section to both counties and their related water agencies as "Counties."

[6]Code of Civil Procedure section 662 reads in pertinent part: "In ruling on [a new trial] motion, in a cause tried without a jury, the court may, on such terms as may be just, change or add to the statement of decision, modify the judgment, in whole or in part, vacate the judgment, in whole or in part, and grant a new trial on all or part of the issues . . . ."

[7]"The court considered each of the following factors in making its determination that the Counties acted unreasonably when the public benefit is balanced against the private damage: (i) The overall public purpose being served by the improvement project; (ii) the degree to which the plaintiffs' loss is offset by reciprocal benefits; (iii) the availability to the public entities of feasible alternatives with lower risks; (iv) the severity of the plaintiffs' damage in relation to risk-bearing capabilities; (v) the extent to which damage of the kind the plaintiffs sustained is generally considered as a normal risk of land ownership; and (vi) the degree to which similar damage is distributed at large over other beneficiaries of the project or is peculiar only to the plaintiffs. The Court finds that the efforts of the Counties to prevent foreseeable damage to plaintiffs were not reasonable in light of the potential for damage posed by the Counties' conduct, the cost to the Counties of reasonable measures to avoid such damage, and the availability of and the cost to the plaintiffs of means of protecting their

previously stricken language into the statement of decision. We will not second-guess the trial court's subjective reasoning. The trial court specifically stated that it had considered the factors and made the findings. The statement of decision that is before us includes the appropriate analysis and we have no reason to reject it.

Counties also contend that the reasonableness calculus must be made as of the time the public entity is making the decision to approve the project, and that the trial court incorrectly focused on conduct that took place after adoption of the federal maintenance regulations. This contention confuses the purpose of the balancing analysis. The balancing analysis required by *Locklin* applies to the public entities' action that results in the injury. In *Belair, supra*, 47 Cal.3d 550, it was the design of the levee system that resulted in the injury so that the reasonableness of the design would have been the proper consideration. Here, the trial court applied the analysis to the Counties' long-standing policy of allowing the Project channel to deteriorate. (See fn. 7, *ante*.) As we explain in more detail in the following section, it was that long-standing policy that caused the damage. We find that the trial court appropriately assessed the reasonableness of that policy according to the factors set forth in *Locklin, supra*, 7 Cal.4th at page 369. (See *Bunch v. Coachella Valley Water Dist.* (1997) 15 Cal.4th 432, 454 [63 Cal.Rptr.2d 89, 935 P.2d 796] (*Bunch II*).)

b. *Inadequate Project Maintenance Supports Inverse Condemnation Liability.*

Counties next contend that the trial court incorrectly based liability upon a finding of negligence, which is not the type of government action to which inverse condemnation applies. Counties also contend that the Corps' prescribed maintenance was the only "plan" of maintenance Counties ever adopted and that there is insufficient evidence to support a contrary finding. We find no merit in either contention.

property from damage. [¶] The Court's determination is supported by the following: First, the 'purpose' of the improvement project involved—a flood control project—militates strongly in favor of liability in light of the enormous 'damage potential of a defective flood control project.' Second, the longstanding negligent operation of a flood control project, such as is documented here, serves no legitimate purpose, nor does it promote any 'reciprocal benefit' which offsets or justifies the damage that was caused by the failure of the Project. Third, 'feasible alternatives' which would have prevented the March 1995 floods were available to the defendants—i.e., continuous maintenance of the Project, including the type of maintenance that was in fact performed through the early 1970's. Fourth, the damage inflicted upon the populace of the Pajaro Valley as a result of the March 1995 flood was in fact 'enormous.' Finally, these damages were not a 'normal risk' of land ownership or of the sort that any of the intended 'beneficiaries' of the Project should be expected to bear. On the contrary, the flood of March 1995 would not have occurred had the Counties maintained the Project in the manner required by law."

■ To be subject to liability in inverse condemnation, the governmental action at issue must relate to the "public use" element of article I, section 19. "Public use" is the threshold requirement. (Cal. Const., art. I, § 19.) "The destruction or damaging of property is sufficiently connected with 'public use' as required by the Constitution, if the injury is a result of dangers inherent in the construction of the public improvement as distinguished from dangers arising from the negligent operation of the improvement." (*House v. L. A. County Flood Control Dist.* (1944) 25 Cal.2d 384, 396 [153 P.2d 950] (conc. opn. of Traynor, J.).) A public entity's maintenance of a public improvement constitutes the constitutionally required public use so long as it is the entity's deliberate act to undertake the particular plan or manner of maintenance. (*Bauer v. County of Ventura* (1955) 45 Cal.2d 276, 284-285 [289 P.2d 1] (*Bauer*).)

The necessary finding is that the wrongful act be part of the deliberate design, construction, or maintenance of the public improvement. "The fundamental justification for inverse liability is that the government, acting in furtherance of public objectives, is taking a calculated risk that private property may be damaged." (*Yee v. City of Sausalito* (1983) 141 Cal.App.3d 917, 920 [190 Cal.Rptr. 595], disapproved on other grounds in *Bunch II*, *supra*, 15 Cal.4th at pp. 447-451.) That is why simple negligence cannot support the constitutional claim. For example, in *Hayashi v. Alameda County Flood Control* (1959) 167 Cal.App.2d 584 [334 P.2d 1048], the appellate court held that the plaintiffs had not stated a cause of action for inverse condemnation because, although the defendant's failure to repair a levee within 10 to 21 days was negligence, it was not "a deliberate plan with regard to the construction of public works." (*Id.* at pp. 590-592.) That is not to say that the later characterization of a public agency's deliberate action as negligence automatically removes the action from the scope of the constitutional requirement for just compensation. So long as the entity has made the deliberate calculated decision to proceed with a course of conduct, in spite of a known risk, just compensation will be owed. (See Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431, 489-490 (Van Alstyne).)

The leading case on the issue is *Bauer*. In *Bauer*, a drainage ditch ran along the downhill border of the plaintiffs' property. As originally constructed, any overflow from the ditch would have run downhill and away from the plaintiffs' property. As time went on, the downhill side of the ditch was built up higher and higher with dirt and debris so that when the ditch later overflowed, it flooded the plaintiffs' land. The county argued that the change in the ditch was a result of its maintenance and negligent maintenance was not the "public use" to which inverse condemnation liability

would attach. The Supreme Court disagreed, explaining: "The rather obscure line between the concepts of 'construction' and 'maintenance' is disclosed by any attempt to define them in mutually exclusive terms and to characterize the raising of a bank of an existing ditch as one or the other. If the 'maintenance' consists of an alteration of the ditch by raising one of the banks, then in a material sense 'maintenance' becomes a species of 'construction.' Had the bank been raised during the original construction it would have been part of the over-all project and hence within the rule . . . . The defendants' argument that damage from maintenance is beyond the purview of [article I,] section [19] invites an artificial distinction which would turn simply upon the passage of time between the original construction and the subsequent alteration and must therefore be rejected." (*Bauer, supra,* 45 Cal.2d at p. 285.)

 Other cases have also found that inadequate maintenance can support liability in inverse condemnation. Two such cases involved damage to property caused by broken water pipes that the public entities had failed to properly maintain. (*McMahan's of Santa Monica v. City of Santa Monica* (1983) 146 Cal.App.3d 683, 696-698 [194 Cal.Rptr. 582] (*McMahan's*), disapproved on other grounds, *Bunch II, supra,* 15 Cal.4th at pp. 447-451; *Pacific Bell v. City of San Diego* (2000) 81 Cal.App.4th 596 [96 Cal.Rptr.2d 897] (*Pacific Bell*).) In both *McMahan's* and *Pacific Bell* the defendants argued that the city's negligent maintenance of its water system was not the type of deliberate government action that could support liability in inverse condemnation. (*McMahan's, supra,* 146 Cal.App.3d at p. 693; *Pacific Bell, supra,* 81 Cal.App.4th at p. 607.) In neither case had the city affirmatively passed a resolution or otherwise enacted a plan that was facially inadequate. But in both cases the city knew that the maintenance program being applied to its water system was inadequate and did not take action to remedy the inadequacy. In *Pacific Bell*, the city repeatedly denied requests for water rate increases to fund repair and replacement of the water system. (*Pacific Bell, supra,* 81 Cal.App.4th at p. 607.) In *McMahan's*, the city did not accelerate its program of water main replacement in spite of a water rate study showing that such a program was necessary to prevent a continued deterioration of the system. (*McMahan's, supra,* 146 Cal.App.3d at p. 695.)

The *Pacific Bell* court found that the deliberateness required for inverse condemnation liability was satisfied by a finding that the public improvement, as designed, constructed and maintained, presented an inherent risk of danger to private property and the inherent risk materialized and caused damage. (*Pacific Bell, supra,* 81 Cal.App.4th at p. 607; and see *House v. L.A. County Flood Control Dist., supra,* 25 Cal.2d at p. 396.) The court pointed out that the damage to private property that resulted from such an inherent

risk was a direct cost of the public improvement. In *Pacific Bell*, the city could have incurred the cost in advance by monitoring and replacing the system before a failure caused damage. When it chose not to do so, article I, section 19 required that the cost be absorbed by the taxpayers as a whole, and not by the individual landowner. (*Pacific Bell, supra*, 81 Cal.App.4th at pp. 607-608, citing *Holtz, supra*, 3 Cal.3d at pp. 310-311.)

The *McMahan's* court used the same rationale to reject the defendant's contention that its conduct could only be characterized as negligence. Relying on *Bauer, supra*, 45 Cal.2d 276, *McMahan's* determined that "whether the City's program of water main installation and replacement is characterized as 'construction' or 'maintenance,' the fact remains that it was inadequate and contributed to the break due to corrosion of the [broken] main. The City's knowledge of the limited life of such mains and failure to adequately guard against such breaks caused by corrosion is as much a 'deliberate' act as existed in *Albers, supra*, 62 Cal.2d 250." (*McMahan's, supra*, 146 Cal.App.3d at p. 696.)

We conclude that in order to prove the type of governmental conduct that will support liability in inverse condemnation it is enough to show that the entity was aware of the risk posed by its public improvement and deliberately chose a course of action—or inaction—in the face of that known risk.

i. *The Trial Court Found That Counties Adopted an Unreasonable Plan.*

During trial, neither side raised the issue of deliberate action. The heart of plaintiffs' case was that Counties had failed to maintain the project as required by the Corps, allowing silt and vegetation to build up and diminish the capacity of the Project. Counties defended by attempting to show, among other things, that their conduct was reasonable in light of regulatory and fiscal restrictions. The trial court's statement of decision referred to the litany of maintenance deficiencies and concluded, "[T]he evidence is persuasive that the County defendants did not act reasonably with regard to their maintenance obligation. Moreover the trial record refuted the Counties' arguments that they acted reasonably in light of regulatory impediments and funding limitations. The Counties' maintenance duties required that certain necessary steps be taken to effectively keep the channel clear. If those 'necessary steps' required greater efforts in the face of funding and regulatory obstructions, then a reasonable course of conduct required a more aggressive approach to overcoming these claimed impediments."

About three months after the statement of decision was filed, the Third District Court of Appeal filed *Paterno v. State of California* (1999) 74

Cal.App.4th 68 [87 Cal.Rptr.2d 754] (*Paterno*). *Paterno*, like this case, was an appeal from a judgment for the plaintiff on an inverse condemnation claim arising from a broken levee. The *Paterno* court held that the trial court's statement of decision was deficient because it based liability "almost entirely on the violation of standards for levee maintenance, in other words, *departures from the lawful plan*, rather than on an unreasonable plan." (*Id.* at p. 90.) The appellate court reversed and remanded the case for retrial, noting that Paterno would have to identify upon what plans he relied and then prove that the plan caused his injury. (*Id.* at p. 91.)

After judgment was entered in favor of the test plaintiff in this case, Counties filed a new trial motion. (Code Civ. Proc., § 657.) Relying upon *Paterno*, they argued that the trial court's decision was against law because the court had based liability on negligent maintenance, not on adoption of an unreasonable plan of maintenance. The trial court denied the new trial motion, but amended the statement of decision to include the finding: "[T]he maintenance deficiencies which the Court's Statement of Decision summarized all resulted from plans or policies which defendants adopted and implemented over a twenty-year period." Thus, the trial court's statement of decision, as amended, found that Counties had adopted and implemented unreasonable plans or policies by failing, over a 20-year period, to take a more aggressive approach to maintenance of the Project.

*Paterno* does not affect our conclusion. In *Paterno*, the appellate court determined that the trial court had adopted the view that unreasonable conduct, as required by *Belair*, meant ordinary negligence, and therefore, that the trial court had not made the necessary finding. (*Paterno*, *supra*, 74 Cal.App.4th at pp. 86, 88.) Unlike the trial court in *Paterno*, the trial court in this case expressly found that the manner in which the channel was maintained for over 20 years was a deliberate policy of the local public agencies responsible for the Project. Such a determination is a finding of the deliberate government action necessary for inverse condemnation liability.

ii. *There Is Substantial Evidence of an Unreasonable Plan of Maintenance.*

Counties insist that the only evidence of a "plan" of maintenance was the Corps' maintenance requirements. ■ In reviewing the sufficiency of the evidence to support the findings of the trial court, we apply the basic principle of appellate practice and consider the evidence in the light most favorable to the plaintiffs, giving them the benefit of every reasonable inference and resolving conflicts in support of the judgment. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].)

■ The record is replete with evidence to support the finding that Counties' maintenance of the Project was conducted pursuant to Counties' deliberate policies. Counties were aware of the maintenance program being applied to the Project and knew that the buildup of vegetation and sand bars diminished the protection the Project was intended to provide. Area farmers, Watsonville officials, and the highest ranking people in both Counties' water agencies alerted county officials to the risk of flooding and to that which needed to be done to remedy the problem. In spite of that knowledge, Counties did not take any action to correct the situation until 1991 or later. Instead, Counties allowed Fish and Game regulations and perceived funding limitations to drive the actual program of maintenance. Thus, Counties' knowing failure to clear the Project channel, in the face of repeated warnings and complaints was not mere negligent execution of the Corps' reasonable plan of maintenance. The "plan" was the long-term failure to mitigate a known danger. That failure persisted for 20 years.

MCWRA argues that it was only Santa Cruz that affirmatively supported the Fish and Game policies of habitat restoration and, therefore, any unreasonable plan or policy of maintenance should be attributable to Santa Cruz, alone. We disagree. It is not necessary to find that Counties expressly endorsed or enacted a contrary policy in order to find that the actual maintenance of the Project was conducted pursuant to deliberate governmental action. It is sufficient that Counties were aware of the risk of failing to adequately clear the channel and chose to tolerate that risk. The reason for the choice is irrelevant to the determination that the action was deliberate. MCWRA indisputably had the obligation, knew the risk, and did not act. Moreover, MCWRA made other, deliberate policy decisions relating to Project maintenance. Among other things, MCWRA's Assistant General Manager and Chief Engineer testified that he had regularly been successful in preventing Fish and Game from interfering with his use of mechanized equipment to maintain other flood control projects in his jurisdiction, and that he chose not to challenge Fish and Game decisions in connection with the Project because he feared jeopardizing the department's cooperation with future permit applications.

Counties also argue that the Corps' semiannual evaluations, which, with one exception, never found Project maintenance to be categorically unacceptable, show that Counties' actual maintenance program was reasonable. The Corps' evaluations are not dispositive. Since the Corps' declaration of unacceptability would have cut off Corps assistance in the event of an emergency, we may infer that such declarations were made only sparingly. Moreover, it is undisputed that the Corps regularly pointed out the problem of vegetation growing in the channel, and that the water agency personnel believed that the maintenance program did not conform to Corps requirements and that it compromised the Project's capacity.

In sum, the record demonstrates that Counties' policy makers made explicit and deliberate decisions with unfortunate but inevitable results. Knowing that failure to properly maintain the Project channel posed a significant risk of flooding, Counties nevertheless permitted the channel to deteriorate over a long period of years by failing to take effective action to overcome the fiscal, regulatory, and environmental impediments to keeping the Project channel clear. This is sufficient evidence to support the trial court's finding of a deliberate and unreasonable plan of maintenance.

 c. *The Trial Court Did Not Err in Defining "Design Capacity."*

██ Counties argued at trial that they could not be liable if the storm had generated more water than the Project had been designed to handle. Counties' evidence was that the peak flow during the storm was 21,300 c.f.s. and the Project's capacity was only 19,000 c.f.s. Plaintiffs' evidence was that the peak flow was somewhere between 16,000 c.f.s. and 18,500 c.f.s., but in any event, less than 19,000 c.f.s. Plaintiffs also argued that by considering the freeboard built into the Project's design, the Project's functional capacity was something more than 19,000 c.f.s. At the close of trial, the court defined the Project's capacity as "19,000 c.f.s. with 3 feet of freeboard." Counties now argue that this definition was erroneous and affects both the inverse condemnation and tort results.

Counties insist that design capacity is a question of law to be determined from the design documents, and that the trial court was obligated to define capacity as 19,000 c.f.s. *within*, not *with*, three feet of freeboard. As we understand the argument, the Corps' Definite Project Report uses "within" and that means that the capacity was 19,000 c.f.s. and no more. By changing "within" to "with," the finder of fact was incorrectly allowed to add the freeboard to the design capacity, which in this case would increase the total capacity to 23,000 c.f.s.[8] The definition was appropriate if it was correct in law and supported by the evidence. (Code Civ. Proc., §§ 607a, 609; and see *LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 875 [148 Cal.Rptr. 355, 582 P.2d 946], and *Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 335 [145 Cal.Rptr. 47].) We find that it was.

The concept of "design capacity" comes from the *Belair* case. The appellate court in *Belair* had decided that because the plaintiffs' land had been historically subject to flooding, the levee failure could not be the proximate

---

[8]Plaintiffs argue that Counties have waived objection to the court's use of the word "with" by affirmatively acquiescing to its use below. Although we agree that Counties did not object below to the use of the word "with" versus "within," the record as a whole makes it quite clear that Counties consistently urged a definition of design capacity that would exclude consideration of freeboard. We will, therefore, treat the merits of the issue.

cause of the damage because it had not increased that historical risk. (*Belair*, *supra*, 47 Cal.3d at p. 558.) The Supreme Court disagreed. *Belair* determined that a flood control project serves the public good by preventing damage that would otherwise be expected to occur in the normal course of events. The flood control project could be a concurring cause of flood damage because adjoining landowners rely on the protection it was built to provide. However, as *Belair* acknowledged, the flood control project could only be a concurring cause if the flood was one the Project was designed to accommodate.

Specifically, *Belair* held: "Thus, in order to establish a causal connection between the public improvement and the plaintiff's damages, there must be a showing of ' "a substantial cause-and-effect relationship excluding the probability that other forces *alone* produced the injury." [Citations.]' (*Souza* v. *Silver Development Co.* [(1985)] 164 Cal.App.3d [165,] 171 [210 Cal.Rptr. 146], fn. omitted.) Where independently generated forces not induced by the public flood control improvement—such as a rainstorm—contribute to the injury, proximate cause is established where the public improvement constitutes a *substantial concurring cause of the injury*, i.e., where the injury occurred in substantial part because the improvement failed to function as it was intended. The public improvement would cease to be a substantial contributing factor, however, where it could be shown that the damage would have occurred even if the project had operated perfectly, i.e., where the storm exceeded the project's design capacity." (*Belair*, *supra*, 47 Cal.3d at pp. 559-560.)

A project's capacity, therefore, bears upon the element of causation. This is true whether we are considering the inverse condemnation claims or the tort causes of action. Counties understandably focus on the dictum in the latter half of *Belair*'s discussion quoted above, in which the court posits, by way of example, that if a storm exceeded the project's "design capacity" the project would no longer be a substantial factor in causing the damage. By narrowing the focus to the phrase "design capacity," Counties have constructed the argument that the relevant level of protection the Project was designed to provide is the single number linked to the term "design capacity" in the Corps' Definite Project Report. According to Counties, freeboard does not count.

In our view, *Belair* did not intend the bright-line rule Counties seek to apply. Such a rule is inconsistent with traditional concepts of causation, and would not advance the just compensation requirement of the Constitution. That is especially true on the facts of this case. As the *Belair* court stated, the issue is whether there is a " ' "substantial" cause-and-effect relationship

[between the public project and the injury] which excludes the probability that other forces *alone* produced the injury.' (Van Alstyne, *supra*, 20 Hastings L.J. at p. 436, italics added.)" (*Belair, supra*, 47 Cal.3d. at p. 559.) To the extent that the public project contributes to the injury, then it remains a concurring cause. Like any other determination of causation, it must be made on the facts of each case. (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624].)

Keeping in mind that the issue is one of causation, we find that it would have been improper to cut off Counties' liability, as a matter of law, at the Project's design capacity of 19,000 c.f.s. because there was evidence to show that the Project was able to hold more than that. The Corps' documents specified that the freeboard could be encroached to allow the Project to carry 23,000 c.f.s. at the point in the channel where the breach ultimately occurred. That means that, with 19,000 c.f.s. in the channel, unless something had occurred to diminish capacity, there would still be room for an additional 4,000 c.f.s. Of significance in this case is the evidence that the extra room the freeboard was intended to provide was eliminated by Counties' ineffective maintenance. For these reasons, it was appropriate to permit the finder of fact to decide if the flood exceeded the protection the Project was intended to provide by permitting a finding that the freeboard was part of that protection. This is the definition the trial court gave. Accordingly, there was no error.

### d. *There Was Substantial Evidence to Support the Findings of Liability.*

Counties next argue that there was insufficient evidence to support a finding that flows exceeded Project capacity. Applying the deferential standard of substantial evidence review, we find no merit to the argument. (*In re Marriage of Arceneaux, supra*, 51 Cal.3d at p. 1133.)

The trial court found that if properly maintained the Project would have "safely conveyed well over 21,000 c.f.s. without overtopping." The jury was not asked to make a finding of capacity. The jury found only that peak flows did not exceed the design capacity of the Project. Even if we assume the jury chose 19,000 c.f.s. as the relevant capacity, there was sufficient evidence to support a finding that the flood did not exceed that. Plaintiffs' expert, Dr. Robert Curry, is a geologist with a specialty in geomorphology. He estimated that the range of likely flows at the site of the Project failure was 16,000 c.f.s. to 18,500 c.f.s., most likely around 17,500 c.f.s. Counties argue that Dr. Curry's scientific techniques were not proven reliable or generally accepted by others in his field, and his opinions should not have been

admitted. ■■ Counties did not make a record of their objection below and, therefore, have not preserved the issue for appeal. ■■■ ■ ■ (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1 [151 Cal.Rptr. 837, 588 P.2d 1261]; and see 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 394, pp. 444-445.)[9] ■■ Dr. Curry's testimony provides substantial evidence to support a finding that the peak flows did not exceed 19,000 c.f.s.

### e. *The Parties Are Expected to Draft the Statement of Decision.*

Counties finally challenge the trial court's statement of decision on the ground it reflects plaintiffs' reasoning, analysis and decision and not that of the trial court. Counties acknowledge there is no authority for their challenge, but argue that in this case the statement of decision was so plainly a rehashing of plaintiffs' closing argument that it simply cannot reflect the trial court's decision. According to Counties, it is hard to believe that the trial judge agreed so wholeheartedly with the other side.

The California Rules of Court provide that the tentative decision is not binding on the court and that the court may instruct a party to prepare a proposed statement of decision. (Cal. Rules of Court, rule 232(a) & (c).) The rules provide ample opportunity for all parties to make proposals as to the content of the statement of decision or to raise objections to a proposed statement. (Cal. Rules of Court, rule 232(b) & (d).) Those procedures were followed here, and we can find no basis in the record or in law to warrant further comment on the issue.

### 4. *State's Issues*

#### a. *State's Liability for Inverse Condemnation Does Not Require a Showing of Unreasonableness.*

■■■ The trial court's statement of decision refers to State's liability in a single paragraph: "The State of California, Department of Transportation, acted unreasonably in its design and construction of Highway 1 where it

---

[9]Having reviewed the evidence in detail, we find that the objection, had it been recorded, would have properly been overruled. Evidence of scientific techniques that have not proven reliable and generally accepted by others in the field is not admissible as evidence. (*People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240].) The *Kelly* rule does not apply to the personal opinions of an expert. (*People v. McDonald* (1984) 37 Cal.3d 351, 372-373 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011]; *Wilson v. Phillips* (1999) 73 Cal.App.4th 250, 254-256 [86 Cal.Rptr.2d 204].) Counties' challenge to Dr. Curry's testimony is that he "theorized" and "hypothesized" about the factors that he believed affected the level of the flood. Counties' objection relates only to the credibility of his opinion, and thus was not subject to exclusion under the *Kelly* rule.

crosses the Pajaro River flood plain. [State] failed to follow its own manual's design criteria for that section of highway. This failure resulted in a dangerous condition of public property. The raised highway embankment functioned as a dam that caused some properties to suffer flood damage and others to be damaged more severely than they would have if the highway design had allowed proper drainage." State contends that the trial court did not use the proper measure of reasonableness in finding State liable, and that State's actions were reasonable in any event. Plaintiffs argue, among other things, that the rule of reasonableness does not apply to State. According to plaintiffs, State is strictly liable and the trial court's application of a reasonableness analysis was unnecessary. We agree with plaintiffs.

The rule of reasonableness was developed in a series of cases beginning with *Belair*. The general rule is that a public entity is liable for inverse condemnation regardless of the reasonableness of its conduct. (*Albers, supra,* 62 Cal.2d at pp. 263-264.) *Belair* modified the general rule when it decided that a rule of reasonableness, rather than the extremes of strict liability or immunity, was appropriate in cases involving flood control projects. (*Belair, supra,* 47 Cal.3d at p. 565.) *Locklin* applied *Belair*'s rule of reasonableness where the defendants were alleged to have drained surface water into a natural watercourse, increasing the volume and velocity of the watercourse, and causing erosion of plaintiffs' downstream property. (*Locklin, supra,* 7 Cal.4th at p. 337.) Under the "natural watercourse" rule, a riparian landowner had a privilege to drain surface water into a natural watercourse, regardless of the effect of that drainage on downstream landowners. (*Id.* at pp. 346-347.) Like *Belair*, *Locklin* declined to impose strict liability, and held: "Because a public agency, like any riparian property owner, engages in a privileged activity when it drains surface water into a natural watercourse or makes alterations to the watercourse, article I, section 19 of the California Constitution mandates compensation only if the agency exceeds the privilege by acting unreasonably with regard to other riparian owners." (*Id.* at p. 367.)

Both *Belair* and *Locklin* applied the reasonableness rule to conduct that was at one time privileged under traditional water law principles. Predictably, the plaintiffs in the next case argued that conduct that had not been so privileged was subject to the general rule of strict liability. (*Bunch II, supra,* 15 Cal.4th 432.) *Bunch II*, like *Belair*, involved the failure of a flood control project. However, in *Bunch II* the injury was caused by the defendants' having diverted and rechanneled a natural watercourse. Diversion of a watercourse was not subject to a common law privilege like the common enemy doctrine or the natural watercourse rule. *Bunch II* confirmed that resolution of flood control cases involved a balancing of the public interest in encouraging flood control projects with the potential private harm they

could cause. *Bunch II* held that the public agency would not be strictly liable for damage resulting from a failed flood control project, whether or not the offending conduct would have been privileged under traditional water law doctrine. Instead, a rule of reasonableness was to apply. (*Id.* at p. 451.)

Although these three cases suggest a trend toward incorporating reasonableness into the inverse condemnation analysis, that trend does not extend to State's conduct in this case because of the public policy considerations to which the reasonableness requirement is tethered. The 1969 article by Professor Van Alstyne provides some insight. (Van Alstyne, *supra*, 20 Hastings L.J. 431.) Van Alstyne noted that the state of inverse condemnation law at the time was very unpredictable due to the courts' application of a variety of conflicting legal principles. Van Alstyne encouraged the courts to abandon reliance upon private law principles and to apply principles of public policy to all inverse condemnation claims arising from unintended physical damage to private property. According to Van Alstyne, public policy does not necessarily require a reasonableness calculus in all contexts. For example, in cases of environmental pollution, a rule of strict liability might provide incentive for the development of antipollution programs. (*Id.* at p. 503.) On the other hand, in what Van Alstyne termed "water damage" cases, a rule that balanced the conflicting concerns of public benefit and private harm would better serve the public in the long run. (*Id.* at p. 502.)

Our Supreme Court adopted the balancing analysis suggested by Van Alstyne in the *Belair*, *Bunch II*, and *Locklin* cases. In *Locklin*, the offending conduct (discharge of surface water into a natural watercourse) would have been privileged under traditional water law principles. The corresponding burden of that privilege fell on the downstream landowners who had to take steps to protect their land from such upstream discharges or suffer the consequences. (*Locklin*, *supra*, 7 Cal.4th at pp. 351-352.) Therefore, since the watercourse naturally subjected the downstream property to flooding and erosion, it would have been unfair to apply a strict liability analysis to public entity landowners upstream. The decisive constitutional consideration of ensuring equitable allocation of the cost of the public undertaking was best advanced in such a case by requiring the downstream owner to show that the public agency had exceeded its privilege by acting unreasonably. (*Id.* at p. 367.)

Policy considerations also favored application of a reasonableness analysis in *Belair* and *Bunch II*, which were both flood control cases. In *Belair* and *Bunch II*, the public improvement had been erected to protect the land that was ultimately injured when the project failed. The project's purpose, to protect private property from the flooding that it could otherwise expect to

suffer periodically, was an important policy reason to apply the balancing analysis. Without requiring the plaintiff to make a showing of unreasonableness, the public agency that built or operated the project would become the guarantor of the land it had undertaken to protect.

An appellate opinion decided after *Belair*, *Bunch II*, and *Locklin* illustrates a situation where public policy favored strict liability rather than reasonableness. (*Akins v. State of California* (1998) 61 Cal.App.4th 1 [71 Cal.Rptr.2d 314].) In *Akins* the defendants had intentionally diverted floodwater onto the plaintiffs' lands for the purpose of protecting other property from flooding. There was no evidence that the project was erected to protect the plaintiffs' property or that the plaintiffs' property had historically been subject to flooding. Since the public improvement involved flood control, *Belair* and *Bunch II* arguably mandated application of a reasonableness analysis. However, the appellate court found that the reasonableness standard did not apply, reasoning that regardless of the importance of flood control, "[u]sing private property not historically subject to flooding as a retention basin to provide flood protection to other property exacts from those owners whose properties are flooded a contribution in excess of their proper share to the public undertaking. We see no reason to put such property owners to the task of proving the governmental entities acted unreasonably in order for the owners to recover in inverse condemnation." (*Akins*, at p. 29.)

The policy reasons for applying a rule of reasonableness in *Belair*, *Bunch II*, and *Locklin* do not apply in this case. The conduct of which plaintiffs complain is that State caused Highway 1 to obstruct the path of the floodwater. Such conduct was not privileged under traditional water law precepts. (*Los Angeles C. Assn. v. Los Angeles* (1894) 103 Cal. 461, 467-468 [37 P. 375]; *Conniff v. San Francisco* (1885) 67 Cal. 45 [7 P. 41].) Therefore, State does not enjoy a conditional privilege as it would under the facts of *Locklin*, and plaintiffs' property would not have been subject to a corresponding burden. In fact, the reverse is true. It is plaintiffs, as the upstream owners, who likely would have had a privilege in this case. And State, as the downstream owner, was bound not to obstruct the flow of water from the plaintiffs' upstream land. (*Locklin*, *supra*, 7 Cal.4th at p. 350; and see *Smith v. City of Los Angeles* (1944) 66 Cal.App.2d 562, 572 [153 P.2d 69].) Therefore, the consideration that controlled the result in *Locklin* (fair apportionment of the loss) is not present here because plaintiffs would not have been expected to take measures to protect their land from a downstream obstruction like the Highway 1 embankment.

The policy reasons for applying reasonableness in *Belair* and *Bunch II* are not present here, either. Highway 1 was not a flood control project and was

not built to protect the plaintiffs' land. The damming effect of the highway created a risk to which those properties would not have been subject if the highway had not been built. The public benefit of the highway extends well beyond the landowners in the Pajaro Valley. While the same may be said of a flood control project, such a project directly benefits the owners of the land in the floodplain, and only indirectly benefits the public as whole. Highway 1, on the other hand, benefits the traveling public as a whole. The owners of the adjacent lands derive no greater benefit from the highway than any other member of the public.

"[T]he underlying purpose of our constitutional provision in inverse—as well as ordinary—condemnation is 'to distribute throughout the community the loss inflicted upon the individual . . . .' " (*Holtz, supra*, 3 Cal.3d at p. 303.) State, in furtherance of the larger public purpose (transportation) has caused injury to a discrete group of private landowners. Those landowners received no more benefit from State's project than did any other user of the State highway system. Plaintiffs ought not to be required to prove unreasonableness in order to recover just compensation for their damage. We hold, therefore, that *Belair*'s rule of reasonableness does not apply to State in this case. In light of our holding, the trial court was not required to undertake the reasonableness analysis required by *Locklin*. The court's conclusion that State's conduct was unreasonable was unnecessary to its determination that State is liable in inverse condemnation, but does not affect its correctness.

### b. *State Had a Duty to Avoid Obstructing the Floodplain.*

The jury found State liable for nuisance and for maintaining a dangerous condition of public property. (Civ. Code, § 3479; Gov. Code, § 835.) State argues that it cannot be liable for these torts because it does not have a duty to protect plaintiffs' property from the failure of a flood control project over which it had no control. State assumes that plaintiffs' claim is premised upon the theory that State should have designed its drainage anticipating that the Project would fail. State misses the point. Plaintiffs do not allege that State is responsible for the failure of the Project or the resulting flood. Plaintiffs allege only that State is responsible for that portion of the damage that can be attributed to the highway's obstruction of the floodplain. Whether the flood occurred because the Project failed to function as intended, or because the rainstorm exceeded the Project's capacity, plaintiffs' claim against State would be the same. As we interpret plaintiffs' position, State had a duty to avoid obstructing escaping floodwater, regardless of the cause of the flood.

"[L]egal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be

imposed for damage done." (*Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 434 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].) In California, the general rule is that all persons have a duty to use ordinary care to prevent others from being injured as the result of their conduct. (*Rowland v. Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) Duty is usually determined based upon a number of considerations. The foreseeability of a particular kind of harm is one of the most crucial of those. (See *Dillon v. Legg* (1968) 68 Cal.2d 728, 739 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]; Gov. Code, § 835.)

The question of whether a duty exists is one of law. The court's task in determining duty is to evaluate generally whether the conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed. (*Ballard v. Uribe, supra,* 41 Cal.3d at p. 573, fn. 6.) ▆▆▆ Under ordinary rules applicable to riparian landowners, both upper and lower riparian landowners have a duty to avoid altering the natural system of drainage in any way that would increase the burden on the other. (*Locklin, supra,* 7 Cal.4th at pp. 337, 354-356; *Keys v. Romley* (1966) 64 Cal.2d 396, 409 [50 Cal.Rptr. 273, 412 P.2d 529].) Traditionally, a lower landowner that obstructs a natural watercourse is liable for damages that result from the obstruction. (*Mitchell v. City of Santa Barbara* (1941) 48 Cal.App.2d 568, 571 [120 P.2d 131].) The rule applies even if the damaging flow in the obstructed watercourse is seasonal floodwater. (*Ibid.*) This common law allocation of duty is appropriate here.

The harm of which plaintiffs complain is that the highway obstruction caused the floodwater to rise higher and stand on the land longer than it would have done if unobstructed. This harm was unquestionably foreseeable. State's "1989/90 Training Course Manual" points out: "A primary cause of flooding in highway and bridge construction is the blocking of a normal drainage flow pattern. Construction of fills, drainage structures and appurtenant structures such as retaining walls all have the potential for blocking the normal flow of drainage water and thus causing flooding. The blocked flow *does not necessarily have to be a watercourse; blockage of an existing flood plain may result in flooding of previously untouched areas.* [¶] In either case, watercourse or flood plain, blockage will result in liability for any damages arising from consequent flooding."

In fact, the harm that State's project ultimately caused was actually foreseen before the highway bypass was ever built. State designed the drainage culverts around 1960. The 1960 design documents presumed that peak flows would result in shallow flooding "for some distance outside the [right of way]." According to State's engineers, these peak flows were

presumed to consist only of rainwater runoff from the surrounding area, not floodwater. Thus, even in the absence of a flood, State's design presumed that some water would back up behind the highway during the heaviest rains.

State's "Design Planning Manual" required that its highway drainage structures be able to accommodate a 100-year storm. In 1963, the Corps reported that a 100-year storm was expected to generate flows within the Project channel of 43,500 c.f.s., a significantly greater volume than it had previously estimated. State concedes that it was aware of the Corps' 1963 estimate of the size of a 100-year storm, and that it knew there was no chance the Project, as it then existed, could contain that volume. Thus, State was aware before it began building the highway bypass in the late 1960's that in the event of a 100-year storm, flooding was virtually certain to occur.

State argues that it had no duty to consider the possibility of a flood because in its correspondence with State engineers the Corps told State that it should assume a Project expansion was going forward. This assurance, however, did not have any bearing on the drainage design or whether that design should consider the risk of flooding. The acknowledged purpose of the Corps' assurance was to assist State's engineers in designing the bridge. In light of the information it received from the Corps, State designed its bridge over the river so that the Corps could make improvements under the bridge without the need to revise the bridge structure. Those improvements were, at best, years away. (And, so far as we can ascertain from the record, no such improvements were ever made.)

It is undisputed, therefore, that when State built the highway bypass in the late 1960's it knew that the Project would not contain a 100-year storm and that no enlargement of the Project had been approved or commenced at that point. A 100-year storm was just as likely to occur in 1970 as it was at any later time. Having built an embankment across the historic floodplain, State also must have known that its embankment would block the flow of floodwater unless it designed the drainage to accommodate a flood.

State cannot avoid liability for the 1995 flood because the Project failed rather than because the storm overwhelmed it. State was expected to design its drainage for a 100-year storm. Since a flood was almost certain to occur in the event of a 100-year storm, State, as a downstream riparian landowner, had a duty to design the highway bypass to avoid obstructing the geologic floodplain. Therefore, it does not matter that the storm that generated the flood in this case was of a lesser magnitude and should have been contained by the Project. State had a duty to anticipate the consequences of a 100-year storm and design accordingly.

c. *Government Code Section 830.6 Is Not a Defense.*

 At the close of all the evidence State moved for a directed verdict on the basis of Government Code section 830.6, design immunity. The trial court denied the motion and the jury ultimately found State liable for a dangerous condition of public property and nuisance. State contends the court erred in denying its directed verdict motion. We disagree.

 A public entity is liable for negligently creating a dangerous condition of public property or for failing to cure a dangerous condition of which it has notice. (Gov. Code, § 835, subd. (a).) However, the entity is immune from such liability if the injury was caused by a public improvement that was constructed pursuant to a plan or design approved in advance by the entity if "there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design . . . or (b) a reasonable legislative body or other body or employee could have approved the plan or design." (Gov. Code, § 830.6.) "The rationale behind design immunity is to prevent a jury from reweighing the same factors considered by the governmental entity which approved the design." (*Bane v. State of California* (1989) 208 Cal.App.3d 860, 866 [256 Cal.Rptr. 468].) A public entity claiming design immunity must plead and prove three essential elements: " '(1) [a] causal relationship between the plan and the accident; (2) discretionary approval of the plan prior to construction; [and] (3) substantial evidence supporting the reasonableness of the design.' [Citation.]" (*Higgins v. State of California* (1997) 54 Cal.App.4th 177, 185 [62 Cal.Rptr.2d 459].)

The elements of causation and approval are not contested. The focus of State's challenge is the third element of the design immunity defense, substantial evidence of the reasonableness of the culvert design. Government Code section 830.6 makes the resolution of this element a matter for the court, not the jury. (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 66 [109 Cal.Rptr.2d 1, 26 P.3d 332].) The task for the trial court is to apply the deferential substantial evidence standard to determine whether any reasonable State official could have approved the challenged design. (*Morfin v. State of California* (1993) 12 Cal.App.4th 812, 815 [15 Cal.Rptr.2d 861].) If the record contains the requisite substantial evidence, the immunity applies, even if the plaintiff has presented evidence that the design was defective. (*Higgins v. State of California, supra,* 54 Cal.App.4th at p. 185.) In order to be considered substantial, the evidence must be of solid value, which reasonably inspires confidence. (*People v. Bassett* (1968) 69 Cal.2d 122, 139 [70 Cal.Rptr. 193, 443 P.2d 777]; *Grenier v. City of Irwindale* (1997) 57 Cal.App.4th 931, 940 [67 Cal.Rptr.2d 454].) Keeping that standard in mind, we review the evidence to determine whether

there is a basis upon which a reasonable State official could have approved the culvert design.

State installed two 48-inch culverts through the embankment on the southern side of the bridge it built over the Pajaro River. There is no dispute that the culverts were not designed to accommodate floodwater. They were designed to accommodate only the rainwater runoff from the adjacent 700 acres. The span beneath the bridge itself provided plenty of clearance for highwater flows down the river channel. However, if the water escaped the channel, it would follow the contour of the floodplain toward the embankment at the southern end of the bridge. The floodwater would have to pass through whatever drainage was installed in the new embankment in order to reach the sea. Plaintiffs point out that since State knew before it built the Highway 1 bypass that the Project could not accommodate more than about 26,000 c.f.s., and that a 100-year storm would generate flows well above that, flooding was foreseeable and the drainage design should have taken it into account.[10]

State's expert, Steve Price, testified that the culverts conformed to the requirements of State's Design Planning Manual and the design itself was "reasonable." He stated that it was not in conformance with the best engineering practices to design the drainage for Project failure and that State did not evaluate the Corps' projects at the time the drainage in this case was installed. Plaintiff's expert, Dr. Curry, had testified that the actual Pajaro River watershed consisted of 1,100 square miles. Price testified, however, that it was appropriate to consider only the 700 acres in calculating runoff because "[t]here are other drainage systems and facilities that are taking care of that water."

State's engineer, Lance Gorman, testified that a reasonable drainage design would accommodate flooding only if the river had not incorporated man-made flood control improvements. According to both Price and Gorman, because there was an existing flood control project, the highway drainage design did not have to consider floodwater. Gorman testified that State worked only within its own area and that it would expect the Corps to provide for flooding, noting that State had expected the Corps to improve the Project to accommodate a 100-year storm. Another reason State never considered flooding, according to Gorman, was that it had never been asked to do so.

---

[10]Plaintiffs also claim that the culverts' gradient flowed upriver rather than down, the opposite of the way they were designed. Arguably, this defect could also defeat the design immunity defense. (*Cameron v. State of California* (1972) 7 Cal.3d 318, 326 [102 Cal.Rptr. 305, 497 P.2d 777].) In light of our conclusion that there is insufficient evidence to support the reasonableness of the design, we need not reach this issue.

The chronology of the State's project is significant. The Corps' flood control project was built in 1949 and, according to Gorman, up until at least 1958 it was reasonable to presume it would hold a 100-year flood. The Highway 1 drainage was designed in 1959 and revised in 1960. In June 1963, the Corps published its "Interim Report," showing that it expected a 100-year storm would generate 43,500 c.f.s. This volume greatly exceeded the Project's capacity. Nevertheless, in September 1963, State engineers approved the 1960 drainage design without reconsidering it in light of the Corps' Interim Report. Mr. Gorman conceded that by 1964, given the Corps' reevaluation of a 100-year storm, it would have been "questionable" to continue to assume the Project would hold such a flood. Thus, according to State's own engineer it "probably would have been better" to design for the Corps' new analysis.

The purpose of the design immunity statute is to avoid having the finders of fact "reweighing the same factors considered by the governmental entity which approved the design." (*Bane v. State of California, supra,* 208 Cal.App.3d at p. 866.) Since State's engineers never took flooding into consideration, it is questionable whether the immunity applies at all. Presuming that it does, we find that State has not offered substantial evidence of reasonableness.

Although State offered evidence that its original design was reasonable, we are troubled by the conclusory nature of that evidence. State's engineers testified that the design was reasonable, but the only foundation offered for their conclusion was the presumption that someone or something else would take care of flooding. Such evidence lacks the solid value necessary to constitute substantial evidence. Moreover, State effectively concedes that under the circumstances that existed at the time the design was approved in 1963, it was no longer reasonable to rely on the Project to contain a 100-year flood. The unreasonableness of the design is further demonstrated by the design documents themselves, which in 1960 presumed that peak flows would cause some shallow flooding. Logic tells us that once it was determined that a 100-year storm was certain to overtop the Project, more extensive flooding would occur. Under these circumstances, we find that State has not offered any substantial evidence upon the basis of which a reasonable public employee could have approved a design that did not take flooding into account.

The trial court's ruling on State's motion for a directed verdict suggests that the court incorrectly intended to allow the jury to determine the reasonableness of the design. It is clear from the record, however, that the jury was not asked to make that determination. ■ A ruling or decision, itself

correct in law, will not be disturbed on appeal merely because it was given for a wrong reason. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 18-19 [112 Cal.Rptr. 786, 520 P.2d 10].) ▮▮▮ Because our independent examination of the record leads us to conclude that State had not offered substantial evidence of the reasonableness of the drainage design, the trial court did not err in denying State's motion for directed verdict.

### d. *Failure of the Project Was Not a Superseding Cause.*

State argues that the breach of the levee was an intervening force that was so extraordinary that it operates as a superseding cause of plaintiffs' injury, cutting off its own liability on all claims. ▮▮▮ Under traditional negligence analysis, an intervening force is one that actively operates to produce harm after the defendant's negligent act or omission has been committed. (Rest.2d Torts, § 441, subd. (1), p. 465.) A defendant's conduct is superseded as a legal cause of an injury if, among other things, the intervening force is highly unusual or extraordinary, not reasonably likely to happen and, therefore, not foreseeable. (Rest.2d Torts, § 442, subds. (b) & (c), p. 467; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 975, p. 366; *Akins v. County of Sonoma* (1967) 67 Cal.2d 185, 199 [60 Cal.Rptr. 499, 430 P.2d 57].) Similar considerations may apply in the context of inverse condemnation. (*Belair, supra,* 47 Cal.3d at pp. 559-560.) The defendant has the burden to prove the affirmative defense of superseding cause, that is, that the intervening event is so highly unusual or extraordinary that it was unforeseeable. (*Maupin v. Widling* (1987) 192 Cal.App.3d 568, 578 [237 Cal.Rptr. 521].) The question is usually one for the trier of fact. (*Ballard v. Uribe, supra,* 41 Cal.3d at p. 572, fn. 6.) However, since the facts upon which State bases its claim are materially undisputed, we apply our independent review. (*Ghirardo v. Antonioli, supra,* 8 Cal.4th at p. 799.)

▮▮▮ State argues that the chain of causation between State's project and the harm that plaintiffs sustained is broken by the extraordinary volume of floodwater flowing from the breach of the levee. Other than to note that the 1995 event was the first time its culverts had been overwhelmed, State does not explain in what way the flooding was not foreseeable, and has not carried its burden on this issue. On the other hand, we find ample evidence that flooding was within the scope of human foresight. The Highway 1 bypass was built across a floodplain. State knew at the time it built the culverts that the Project channel could not hold a 100-year storm so that in the event of a 100-year storm, flooding was almost certain to occur. And a 100-year storm was, indisputably, foreseeable. Thus, the flooding, whether caused by the failure of the levee or by the size of the storm, was not so extraordinary an event that State should be relieved of its liability.

### 5. *Monterey Liability*

#### a. *Monterey's Liability Is Not Derivative.*

 Monterey attacks the judgment against it on the ground that the trial court disregarded the separateness of Monterey and MCWRA and incorrectly determined that Monterey could be derivatively liable for MCWRA's inadequate maintenance of the Project. We reject this argument because the record is clear that the judgment against Monterey was based on Monterey's direct liability.

The jury received no instruction on vicarious liability, nor was the verdict form drafted to accommodate a vicarious liability theory. The special verdict identified each of the defendants separately, and the jury apportioned damages separately, assigning 30 percent to MCWRA and 23 percent to Monterey. The trial court expressly found that "Monterey County, while a separate legal entity from [MCWRA], concurrently exercised dominion and control over the Project," and concluded that Monterey and MCWRA were "jointly responsible." Therefore, both finders of fact determined that Monterey's liability was joint or concurrent, but not derivative.

#### b. *Monterey Substantially Participated in the Project.*

Monterey contends that since it did not do anything about the maintenance of the Project channel, and because, it claims, it had no authority to do anything, it cannot be liable for inverse condemnation. We find that Monterey had the power and the duty to act and that its failure to do so, in the face of a known risk, is sufficient to support liability under article I, section 19.

A public entity is a proper defendant in an action for inverse condemnation if the entity substantially participated in the planning, approval, construction, or operation of a public project or improvement that proximately caused injury to private property. (*Wildensten v. East Bay Regional Park Dist.* (1991) 231 Cal.App.3d 976, 979-980 [283 Cal.Rptr. 13].) So long as the plaintiffs can show substantial participation, it is immaterial "which sovereign holds title or has the responsibility for operation of the project." (*Stoney Creek Orchards v. State of California* (1970) 12 Cal.App.3d 903, 907 [91 Cal.Rptr. 139].)

In the majority of cases that apply the substantial participation test, the public entity has defended an inverse condemnation claim on the grounds that the improvement was private, not public. There is no dispute here that

the Project was a public project. Thus, the holding in these cases is not directly applicable. However, the rationale is instructive. One such case is *Frustuck v. City of Fairfax* (1963) 212 Cal.App.2d 345 [28 Cal.Rptr. 357] (*Frustuck*). In that case the city approved a subdivision and drainage plans for private property upstream from the plaintiffs' property. The subdivision increased runoff that ultimately harmed the plaintiff's property. The appellate court agreed that the harm had been caused by the drainage system's upstream diversion of water and that the city, in approving the plans for the subdivision, had substantially participated in that diversion. The court explained, "The liability of the City is not necessarily predicated upon the doing by it of the actual physical act of diversion. The basis of liability is its failure, in the exercise of its governmental power, to appreciate the probability that the drainage system from [the private subdivision] to the Frustuck property, functioning as deliberately conceived, and as altered and maintained by the diversion of waters from their normal channels, would result in some damage to private property." (*Id.* at p. 362; accord, *Sheffet v. County of Los Angeles* (1970) 3 Cal.App.3d 720, 734-735 [84 Cal.Rptr. 11].)

In cases where there is no dispute concerning the public character of an improvement, substantial participation does not necessarily mean actively participating in the project, as Monterey contends, but may include the situation where the public entity has deliberately chosen to do nothing. For example, a public entity is liable in inverse condemnation for damage resulting from broken water pipes when the entity responsible for the pipes has deliberately failed to maintain them. (*McMahan's, supra,* 146 Cal.App.3d 683; *Pacific Bell, supra,* 81 Cal.App.4th 596.) Of course, the entity must have the ability to control the aspect of the public improvement at issue in order to be charged with deliberate conduct. In tort cases, it has been held, "in identifying the defendant with whom control resides, location of the power to correct the dangerous condition is an aid." (*Low v. City of Sacramento* (1970) 7 Cal.App.3d 826, 832 [87 Cal.Rptr. 173].) The ability to remedy the risk also tends to support a contention that the entity is responsible for it. "Where the public entity's relationship to the dangerous property is not clear, aid may be sought by inquiring whether the particular defendant had control, in the sense of power to prevent, remedy or guard against the dangerous condition . . . ." (*Id.* at pp. 833-834; accord, *Fuller v. State of California* (1975) 51 Cal.App.3d 926, 946-948 [125 Cal.Rptr. 586].)

The rule we draw from these cases is that a public entity is a proper defendant in a claim for inverse condemnation if it has the power to control or direct the aspect of the public improvement that is alleged to have caused the injury. The basis for liability in such a case is that in the exercise of its governmental power the entity either failed to appreciate the probability that

the project would result in some damage to private property, or that it took the calculated risk that damage would result. (See *Frustuck, supra,* 212 Cal.App.2d at p. 362.)

Returning to the instant matter, although Monterey contends that it had no obligation or any power to control the Project maintenance, the contention does not withstand scrutiny. In December 1947, Monterey entered into an indemnity agreement with Santa Cruz, San Benito and Santa Clara Counties. Just two months before Monterey executed that agreement, MCWRA's predecessor, the Monterey County Flood Control and Water Conservation District, had given its assurance to the federal government that it, along with the other local interests, would maintain and operate the Project as the Corps required. This assurance is the "resolution marked Exhibit 'A'" in the following excerpt from the indemnity agreement that Monterey executed: "each County assumes to itself the sole obligation and responsibility occasioned by the adoption of the resolution marked Exhibit 'A,' for that portion of the project which is to be constructed within it's [*sic*] boundaries and being bound to each other County to hold them and each of them harmless and free from any liability or obligation arising by reason of the adoption of the resolution marked Exhibit 'A' as to that portion of said project within it's [*sic*] own boundaries; *meaning that each County will take care of the assurances given and obligations incurred by reason of the resolution marked Exhibit 'A' insofar as they relate to that part of the project being constructed within it's [sic] boundaries.*"[11] (Italics added.) The plain language of this agreement supports the conclusion that Monterey assumed responsibility for the Project's operation and maintenance.

In practice, Monterey did exercise control over the Project by virtue of its financial control over MCWRA. Monterey and MCWRA and its predecessor district have always shared a common board of supervisors and common boundaries.[12] County employees are considered ex officio employees of MCWRA and are required to perform the same duties for MCWRA that they perform for Monterey. (Stats. 1990, ch. 1159, § 16, p. 4841, West's Ann. Wat.—Appen., *supra,* § 52-16; Stats. 1947, ch. 699, §§ 2, 7, 8, pp. 1739, 1744 [repealed], West's Ann. Wat.—Appen., former §§ 52-2, 52-7, 52-8.

---

[11]Monterey argues in its opening brief that its execution of the indemnity agreement was probably a mistake, and that the water district should have executed it instead. Although Monterey insisted throughout the proceedings below that it was an improper defendant, it never argued that it might have executed the agreement by mistake. There is no direct evidence in the record to support this argument, and we decline to consider it for the first time on appeal.

[12]Although MCWRA is also governed by an appointed board of directors, that board did not come into being until the 1990 Water Resources Act. (Stats. 1991, ch. 1130, §§ 5, 10, pp. 5440, 5442, West's Ann. Wat.—Appen. (1999 ed.) §§ 52-48, 52-53.)

Although Monterey and MCWRA are separate entities, the fact that they had governing boards, employees, and boundaries in common is relevant to the analysis. "[C]ommon governing boards do not invariably indicate county control, but certainly that fact is relevant to the inquiry." (*Rider v. County of San Diego* (1991) 1 Cal.4th 1, 12 [2 Cal.Rptr.2d 490, 820 P.2d 1000] (*Rider I*).) Here, we find it significant because of the financial connection between the two entities.

Monterey financial statements reported MCWRA financial activity as if MCWRA was a part of the county. The statements expressly state that they do not report the financial activity of those agencies over which Monterey cannot impose its will or with which Monterey does not share a financial benefit, burden relationship. By implication, the inclusion of MCWRA on Monterey's financial statements means that Monterey itself considers that it is able to impose its will on MCWRA, and that there does exist a financial benefit, burden relationship between Monterey and MCWRA.

Further evidence of Monterey's control is the fact that MCWRA never had a revenue source, independent of the county's financial resources, that was sufficient to fulfill its promise to operate and maintain the Project. At least since 1974 MCWRA had entirely neglected the Project channel in favor of maintaining the levees because there was not enough money to do both. The main reason funding was so limited was that MCWRA's funding for the Project came from "Zone 1," the geographical area directly served by the Project. Zone 1 consists largely of agricultural land and the little town of Pajaro. Since the geographical area is relatively small and the town of Pajaro is economically disadvantaged, the revenue-generating potential of Zone 1 is and always has been very limited. Therefore, the only way MCWRA could have afforded to undertake the needed maintenance of the Project was to depend upon assistance from the county.

There is no dispute that Monterey's board of supervisors was aware of the maintenance needs of the Project, and the risk of flooding that it posed. From time to time, the board allocated money from its general fund for other programs and projects undertaken by MCWRA. Although Supervisor Del Piero, who represented the district that included Zone 1, attempted several times during the 1970's and 1980's to have Monterey's board make allocations to augment MCWRA's Zone 1 funding, he was, for the most part, unsuccessful.

Monterey cites *Galli v. State of California* (1979) 98 Cal.App.3d 662 [159 Cal.Rptr. 721] (*Galli*) in support of its contention that an entity cannot substantially participate if it has done nothing. In *Galli*, the local levee maintenance district was liable in tort and inverse condemnation for flood

damage resulting from the failure of a levee. The plaintiffs argued that State should also be liable because it had substantially participated in the levee maintenance. The plaintiffs based their argument primarily upon the assertion that the levee was part of a comprehensive water resource development system under the general control of State and State knew that the levee had maintenance problems. (*Id.* at p. 688.) The appellate court rejected the plaintiffs' argument on the ground, among others, that the levee in question was a nonproject levee. A nonproject levee was not required to be maintained to State or federal standards and was not inspected by State, and, consequently, was not under the general control of State as far as its maintenance was concerned. For that reason, State's knowledge of the maintenance problems was not enough to establish substantial participation. (*Id.* at pp. 681, 688.) *Galli* is distinguishable because, as we have explained, Monterey's actual knowledge of the maintenance problems was coupled with its actual ability to control Project maintenance.[13]

Monterey argues that it never had any obligation to maintain the Project or any obligation to fund MCWRA to do so. The Supreme Court rejected a similar argument long ago in *Shea v. City of San Bernardino* (1936) 7 Cal.2d 688 [62 P.2d 365]. In that case the city argued that it was powerless to fix a dangerous condition that existed in a railroad crossing because the Railroad Commission had exclusive jurisdiction over its right of way. The Supreme Court held "the improvement of streets within the boundaries of a city is an affair in which the city is vitally interested. The governing board and officers of the municipality in dealing with such an affair may not complacently declare that they were powerless over a long period of years to take any steps to remedy a defective and dangerous condition that existed in one of the principal streets of the city." (*Id.* at p. 693.) The court's rationale in that individual personal injury matter applies with even greater force where the risk threatens an injury such as that which occurred here.

The constitutional basis for all takings jurisprudence supports a finding of liability in these circumstances. That is, the owner of private property ought not to contribute more than his or her proper share to the public undertaking. The purpose of article I, section 19 is to distribute throughout the community the loss that would otherwise fall upon the individual. (*Holtz, supra,* 3 Cal.3d at p. 303.) If Monterey had chosen to fund maintenance efforts to the degree that Mr. Madruga and Supervisor Del Piero determined was necessary, the

---

[13]Monterey also cites *Rider I, supra,* 1 Cal.4th 1, *Vanoni v. County of Sonoma* (1974) 40 Cal.App.3d 743 [115 Cal.Rptr. 485], and *Rider v. County of San Diego* (1992) 11 Cal.App.4th 1410 [14 Cal.Rptr.2d 885]. These cases involved certain constitutional taxing and debt limitation requirements and were decided on facts vastly different than those before us. We find them inapposite.

flood would not have occurred. In failing to expend funds on the Project, Monterey benefited the ultimate recipients of those funds and took the risk that plaintiffs would be harmed as a result. Therefore, it is proper now to require the county to bear its share of the loss these plaintiffs incurred.

## D. DISPOSITION

The judgment is affirmed.

Elia, J., and Wunderlich, J., concurred.

A petition for a rehearing was denied July 23, 2002, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied September 18, 2002. George, C. J., and Baxter, J., did not participate therein.